MAYS v. PREWETT.

(*Nashville.*   March 18, 1897.)

1. RESCISSION.  *Granted, when.*

A transaction, unconscionable in its nature, effected by false and fraudulent representations made to a person enfeebled in body and mind by an incurable disease, addicted to opium, and harassed by gloomy apprehensions, though not insane, will be rescinded at the suit of the party defrauded, or his heirs or representatives.

Cases cited: Hadly *v.* Latimer, 3 Yer., 537; Coffee *v.* Ruffin, 4 Cold., 514; Seat *v.* McWhirter, 93 Tenn., 569; Gass *v.* Mason, 4 Sneed, 506; Craddock *v.* Cabiness, 1 Swan, 481; Parrott *v.* Parrott, 1 Heis., 687; Knòx *v.* Haralson, 2 Tenn. Ch., 236.

FROM   WILLIAMSON.

Appeal from Chancery Court of Williamson County. THOMAS H. MALONE, Ch.

H. H. COOK for Mays.

ATHA THOMAS and MORTON B. HOWELL for Prewett.

McALISTER, J.   The real litigation in this case is evolved from the allegations of the cross bill. The original bill was filed by F. H. Mays against the defendants for the foreclosure of a mortgage on certain personal property executed to secure the pay-

ment of two notes—one for $500, and the other for $200. Defendants answered the bill and resisted the collection of the notes, and by cross bill sought to have said notes, with two other notes for $500 each, surrendered up to be canceled. The allegations of the cross bill are, that on the eighth of August, 1894, J. C. Prewett and wife conveyed to complainant, F. H. Mays, a house and lot in the city of Nashville for an expressed consideration of $1,600; that, in fact, no money was paid by F. H. Mays for the house and lot, but he gave in exchange therefor certain live stock, farming implements, household and kitchen furniture, valued at $1,600, and certain corn, hay, and oats at a valuation of $200. Complainants to the cross bill charge that this personal property so conveyed in exchange for the house and lot at a valuation of $1,800 was not, in fact, worth more than $930 at said date. It is further alleged in the cross bill that, on the same day, to wit, the eighth of August, 1894, Mays leased to J. C. Prewett a farm in Williamson County for a term of three years, at a yearly stipulated rental of $500, as evidenced by three promissory notes executed by the said J. C. Prewett to F. H. Mays, payable in one, two, and three years, and, to secure the payment of said rental notes at maturity, J. C. Prewett executed a mortgage on all the personal property he had received from F. H. Mays in exchange for the house and lot in Nashville. A note for $200, executed by Prewett in

payment of the corn, hay, oats, etc., was also included in this mortgage. It is alleged that, in addition to the house and lot received by Mays in the trade, he also received a lot of household and kitchen furniture in the house at Nashville, worth $150. It is claimed that the house and lot in Nashville, valued at $1,600 in the trade, was worth $2,000, and, in addition to this, it is charged that J. C. Prewett did not get any credit for the sum of $150, which Mays agreed to pay for the household and kitchen furniture in the house at Nashville. It is charged that Mays also defrauded Prewett to the extent of $900 in the valuation fixed upon the stock and personal property on the Mays farm in Williamson County. It is also charged that the rental of said farm is reasonably worth only $250 per annum, and that Mays, in demanding $500 of the deceased, defrauded him of $250 per annum, or $750 for three years. Complainants in the cross bill charge that J. C. Prewett was wholly incapable, by reason of mental infirmity, of making the contracts in question; that he had been an invalid for several years and had become a confirmed opium eater and had lost all ability to make a contract. Complainants charge that E. H. Mays took advantage of the helpless condition of J. C. Prewett and practiced the grossest frauds upon him.

It is shown that under the lease of the farm J. C. Prewett had no right to sublet the house or farm, or any part of same. By the terms of the

mortgage conveying the live stock to secure the three rent notes of five hundred dollars each, J. C. Prewett was to keep all of the stock upon the place, together with its increase, and Mays had the right to take possession of same in default of payment of first or any subsequent note. Again, it is charged that Mays represented to Prewett that five of the cows traded were thoroughbred, full-blooded Jerseys, and that said representation was false.

Complainants, in the cross bill, pray that all the contracts be declared fraudulent and void, and set aside; that the house and lot, household and kitchen furniture, be restored to complainant, and that dower and homestead, as well as the exempt property, be assigned to the widow, Mrs. M. F. Prewett.

The cause was heard by the Chancellor upon the pleadings and proof. The Court was of opinion that the allegations of the cross bill were met and denied by the answer, and were not sustained by the proof. The cross bill was dismissed with costs. Complainant, F. H. Mays, was given a decree for $500, amount of first rental note, and also for $200, amount of note executed by J. C. Prewett, for corn, hay, oats, etc., on Mays' farm. The Chancellor also decreed that the fund arising from sale of live stock and other personal property mortgaged to secure rental notes, and amounting to $620, be appropriated to the satisfaction of said decree, and pronounced a decree in favor of Mays for balance, amounting to $115.31. Defendants appealed and have assigned errors.

The sixth assignment of error is, that J. C. Prewett was too feeble in body and mind to make a trade; that he was a morphine eater and affected with an incurable disease. So the first question presented is, whether J. . C. Prewett, at the time these transactions occurred, was possessed of sufficient intelligence to understand and appreciate the nature of his acts. The law on the subject of capacity is, that where the party is capable of doing the act, and there is no fraud, no concealment, and no advantage taken, the Courts will not interpose. *Hadly* v. *Latimer*, 3 Yer., 537; *Coffee* v. *Ruffin*, 4 Cold., 514; *Seat* v. *McWhirter*, 93 Tenn., 569.

The contracts in question were executed on August 8, 1894. The record shows that, for some months previous to this date, the deceased, J. C. Prewett, had been in an impaired state of health, superinduced by a disease called by the medical experts, "Hodgkin's disease," which was characterized by an enlargement and inflammation of the glands, or, as described by one of the physicians, an infiltration of the glands. This disease is regarded by physicians as a fatal malady, and deceased was advised there was little hope of his recovery. The deceased had been employed for many years as a freight conductor on the Decatur division of the Louisville & Nashville Railroad, and continued to discharge his duties up to June, 1894, when he was discharged. Towards the close of his service on the railroad, the deceased was frequently granted leave of absence on account of his infirmity,

to enable him to visit the springs and receive medical attention.    Some of his associates in the railroad service testify that, by reason of his disease, the deceased was incapacitated for the proper discharge of his duties, and express the opinion that his mind was thereby affected, and they refer to instances indicating mental aberration.    There is also evidence tending to show that during this period the deceased resorted to the use of opium and morphine to relieve his suffering.    Dr. Cliffe, who saw the deceased three or four times after his removal to the Mays farm, in Williamson County, expresses the opinion that when he saw him he was not capable of making a trade involving any complications.    Witness saw deceased within a week after his removal to the Mays place, and several times after that at medical office of witness, in Franklin.    The death of Mr. Prewett occurred October 14, 1894, following his removal to Mays' place, in August.    Witness, on cross-examination, does not remember any irrational remark made by the deceased, but the impression made on witness at the time was "there was a little want of mental equilibrium."

Dr. C. A. Black testified that he saw deceased for the last time on the twenty-fifth of June or July, and deceased told him he had been quite sick for some time and under the care of a physician who had told him his disease was incurable; that deceased seemed much worried over his condition; that witness was attending wife of deceased, and

simply saw him on the occasions of his visits to Mrs. Prewett. The witness expresses the opinion that, from what deceased told him—how he had been, and of his expecting to die very soon—that he was not in much of a condition to trade. "I was surprised at the trade he made, and when I heard it I made the remark I thought he must have been crazy, or he would not have made a trade of that kind; yet, I never examined him as to his mind." Witness, however, on cross-examination, stated that deceased seemed only worried about his condition; "that he talked on one subject about as well as on another," and witness' idea that Prewett's mind was impaired was based upon the fact that he (witness) would not have made a trade like that if he expected to die so soon.

Mrs. Prewett, widow of deceased and one of complainants in the cross bill, states that about the time the trade was made, her husband acted very strangely; that up to this time he had been very kind to his family, and an instance of unkindness cited by her was the whipping of one of her grandchildren, a small girl, a thing he had never done before. Another instance cited indicating his changed mental condition, was that his oldest son came up to caress him, and that deceased cried; that he was subject to fits and paroxysms of anger about that time, and she would be compelled to give him morphine and throw water on him; that deceased had been taking opium and morphine for about four

weeks before the trade, and that he continued the use of these drugs up to the date of his death.

Mrs. Rosa Prewett, wife of J. T. Prewett, one of the complainants in the cross bill, states that on the day the trade was made, to wit, August 8, 1894, the deceased took two good-sized doses of morphine, about two hours apart.

T. J. Prewett, son of deceased, and another cross complainant, says that on account of his health his father had not railroaded any to amount to anything for about two years before he died; that prior and up to August 8, 1894, the health of deceased was very bad. He was very ill and cross, and had to keep under the influence of morphine all the time, so he could get around; that was the only thing that would ease him; that he (deceased) did not talk right. "He would say things, and when we would ask him about them, he would say he did not say them, and he did not talk to my mother as he had been in the habit of doing before; the children would make him mad," etc. The witness did not think mental condition of deceased was good. He would use dirty, smutty words around the house, a thing he never did before. When the neighbors would come in to see him, he would get up and go into the back yard. He never did that before.

J. E. K. Prewett, another son of deceased, and one of the complainants to the cross bill, testified that, in his opinion, mind of deceased was unsound; that he treated his wife unkindly; was the cause of

14 p—31

his (witness) losing his job on the railroad. "I told him not to worry himself, and he got up and hit me with a chair. Then he was talking to a visitor and abused him very roughly. This is what makes me think his mind was unsound." That he was addicted to morphine; had always been kind and confiding to his family.

As opposed to the testimony of these witnesses, in respect to the mental capacity of deceased, J. C. Prewett, complainant, relies upon the testimony of J. B. Young and wife, and William Brown, who saw and conversed with deceased about the time of the trade, and who discovered nothing irrational in his conduct. Dr. Brower, Superintendent of the Nashville City Hospital, states that deceased was under his treatment for probably three months. States that deceased was brought before one of the clinics, and his peculiar disease lectured on, by Dr. Paul F. Eve, before the medical class. Witness states the disease was general granular enlargement; the lymphatic glands were enlarged, and general enlargement and inflammation of the lymphatic system. This witness, from his contact with deceased, expresses it as his opinion that his mind was perfectly clear, and that he never saw anything indicating mental aberration; that his physical condition had not affected his mind at all. Dr. Brower stated that it was in the winter preceding his testimony that he saw deceased, and it was after deceased moved to Franklin. Finally, he states that he does not recollect when he

saw deceased last. We are of opinion, from the statements of the witness, that it must have been some time during the medical lectures of 1893–1894, extending from September to March, that witness saw deceased, which was long anterior to this trade.

Dr. Douglass testified that "J. C. Prewett (deceased) was a patient under my care for about three weeks. This was probably two months before his death. He suffered with an obscure blood trouble, known as Hodgkin's disease. While under my care and observation, he was perfectly sound in mind; detailed the history of his illness in a clear and rational manner. Indeed, he was unusually bright for one in his station. At no time did he give any evidence of any mental weakness or incapacity. He kindly consented to go with me before the Academy of Medicine, where his disease and general condition was observed by many physicians." The witness further stated that "a few days after his death, some gentlemen, claiming to be the sons of J. C. Prewett, called upon me and requested me to sign a paper stating that I knew deceased to be of unsound mind. This I positively refused to do, and said to these gentlemen that I knew such was not the case when I last saw the deceased, nor was his disease of a nature to affect the mind until its last stages were reached." In conclusion, the witness gives it as his professional opinion, that J. C. Prewett was competent to execute any business while under his care.

While the testimony of Dr. Douglas is very clear, as it appears of record, it is only his examination in chief. Cross-interrogatories were propounded which were never answered, probably through some mistake or inadvertence. Later on we find copied into the record what purports on its face to be an agreed statement of Dr. Douglas' evidence. In this statement the time is not fixed when Dr. Douglas saw and treated the deceased. Unless it is shown that the professional opinion of Dr. Douglas was based upon an examination of the deceased, made at or about the time of these transactions, it would not be entitled to the same weight.

The testimony of Dr. Brower and that of Dr. Douglas being indefinite on this point, cannot outweigh the testimony of other witnesses, who speak of the mental condition of the deceased at a period of time in close proximity to these transactions. If, however, it be conceded that the testimony presented in the record fails to establish the incapacity of the deceased, at the time these contracts were executed, it does demonstrate a state of mind that would render the party an easy victim of a designing man. "A degree of weakness of intellect far below that which would justify a proceeding in lunacy, coupled with other circumstances, to show that the weakness, such as it was, had been taken advantage of, will be sufficient to set aside any important deed." 1 Story's Eq., Sec. 237.

And again, at Sec. 234, the author says, viz.:

Mays *v.* Prewett.

"Contracts are utterly void when made by a person who, though not positively *non compos* or insane, is yet of such great weakness of mind as to be unable to guard himself against imposition or to resist importunity or undue influence. And it is quite immaterial from what cause such weakness arises— whether it arises from temporary illness, general mental imbecility, the natural incapacity of early infancy, the infirmity of extreme old age, or those incidental depressions which result from sudden fear, or constitutional despondency, or overwhelming calamities. For, it has been well remarked, that although there may be no direct proof that a man is *non compos* or delirious, yet, if he is a man of weak understanding, and harassed and uneasy at the time, or if the deed is executed by him *in extremis*, or by a paralytic, it cannot be supposed that he had a mind adequate to the business which he was about, and he might be very easily imposed upon." *Gass* v. *Mason*, 4 Sneed, 506; *Craddock* v. *Cabinoss*, 1 Swan, 481; *Parrott* v. *Parrott*, 1 Heis., 687; *Knox* v. *Haralson*, 2 Tenn. Ch., 236.

It is conceded, or at least not disputed, upon this record, that, at the date of these transactions, the deceased was suffering with an incurable malady; that he had been advised by his physicians there was no hope of his recovery, and this fact was fully realized by him. We think the weight of the evidence shows that, superinduced by these conditions, the mental temperament of deceased had been

transformed from that of habitual kindness and cheerfulness to that of despondency and feebleness; that this mental transformation had been working by slow degrees for many months, and had manifested itself more especially to members of his family and those associated with him in business.

W. A. Sanders was a brakeman on defendant's train. He states that Mr. Prewett's health was very bad for three or four months before he quit business. "His mind was in bad condition; he was absent-minded; he made very many mistakes, and could not remember the orders he had received. I had to look over his orders and show him where he made a mistake. He made a mistake once of an hour in looking at his watch. He would make mistakes about taking sidings. He would make us take sidings an hour too early. His mind was failing five or six months before he quit the road. He quit the road the first of July."

M. L. Andrews, a railroad conductor, testified: "Saw deceased in June and July, 1894; talked with him about his condition. He showed me the swollen places on his body; said the doctors told him it was a very strange case. He was in poor health in June." This witness states that deceased was a "quiet, peaceful man before he was taken sick, and a man of a good deal of forethought, and one trusted in our association. Afterwards he was very vile, very fiery, and hard to control. He held a very important place with us on the Grievance Committee at Louis-

ville, and we took him off on account of his fiery disposition. I did not know at first what to attribute this to. When he showed me the condition he was in, and showed me his body, in Decatur, I attributed it to his disease."

C. H. Green testifies that he worked for the railroad, as brakeman, under deceased; that deceased did not work for the company after June 25, 1894. His health was very poor. He would run a week or two and then lay off on account of his health. His memory was not very good. "He would ask me to get the orders and read them to him and explain;" that deceased could not remember the stations where he should stop; that he had to depend upon the engineer and brakeman; that witness did not feel safe on the train. Witness knew deceased took opium all the time. "He told me not to say anything to his friends about it. He carried it with him all the time. I know he used it frequently when he had those smothering spells." Witness stated, on cross-examination, that deceased got his train into a ditch, and had one man killed on his train.

Without quoting further from the testimony, it is evident to our minds that at the date of these transactions the deceased. was in a very enfeebled condition, both of mind and body. The trade he was induced to make with Mays was an unconscionable bargain. Deceased conveyed to Mays a house and lot in the city of Nashville, for an expressed consideration of $1,600, together with household and

kitchen furniture, at a valuation of $150. He received in payment of this property certain live stock, farming implements, household and kitchen furniture, situated on Mays' farm, in Williamson County, valued at $1,600, and further agreed to pay $200 for corn, hay, and oats said to be on the farm at that time. After the death of Prewett, this personal property was all valued by disinterested witnesses, and they assessed the whole of it at $940. We think the property, at the time of the trade was not worth exceeding $1,100 or $1,200, and yet Mays induced Prewett to take it in the trade at a valuation of $1,800.

As a part of this trade Mays then leased to Prewett the farm in Williamson County for a term of three years, at a stipulated yearly rental of $500. The great weight of the evidence is, that this was a very inferior farm, and its rental value did not exceed over ($250) two hundred and fifty dollars per annum. Yet Mays demanded of Prewett the exorbitant rental of five ($500) hundred dollars per annum, and required him to secure it for the entire term of three years, by the execution of a mortgage on the live stock, farming implements, etc., which he had exchanged with Prewett for the house and lot in Nashville. Thus it appears that, for the entire term of three years, deceased agreed to pay for the farm $750 more than it was reasonably worth.

The record further shows that this mortgage has

been foreclosed for the payment of the first rent note, and all this personal property was bought in by Mays, at a valuation of $644. The Williamson County farm was surrendered to Mays shortly after the end of the first year. Mays is now in possession of his farm, and all the live stock and farming implements which he exchanged with Prewett for the house and lot in Nashville, and he is also in possession of this house and lot. Mays, in talking of this trade to one of his neighbors, remarked that, "when he caught a sucker he bumped his head."

Again, the proof shows that Prewett was to exchange his house and lot, at a valuation of $1,600, for the personal property on the Mays farm, at a valuation of $1,800. Mays also agreed to take the household and kitchen furniture in the Nashville house at a valuation of $150. It will thus be seen that the Nashville house and furniture were to be exchanged, at a valuation of $1,750, for the live stock, farming implements, etc., at a valuation of $1,800, making a difference in favor of Mays of only $50, and, yet, when the mortgage is executed by Prewett on the personal property to secure the rent notes, the mortgage is also made to include a note for $200, when the amount due was only $50.

Again, the record shows that when Prewett was negotiating with Mays for the live stock, the latter represented that five of the cows were thoroughbred Jerseys. The proof shows that Mays had no thoroughbred Jerseys, but only ordinary graded

Jerseys. The difference in value would amount to from $300 to $500. Further, the proof shows that Mays represented one of the mares to be a very fine animal, and did not disclose the . fact that the mare was a stump sucker.

In view of the facts disclosed in this record, complainants are entitled to a rescission of all these transactions, and an account will be taken between the parties. Complainant, Mays, will be charged with the reasonable rental of the Nashville house from August 8, 1894, to the stating of the account, and will be credited with all taxes paid by him on said property. Defendants will be charged with the reasonable rental of the farm during the time they occupied it, and with the profits arising from the dairy. They will also be charged with the reasonable rental of the personal property, and with any loss of it, or any depreciation in its value. The cause will be remanded for the stating of said account. Mays will pay all the costs of both Courts.