IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 18, 2004 Session

## IN RE: UPPER CUMBERLAND DEVELOPMENT DISTRICT, OFFICE OF THE PUBLIC GUARDIAN, CONSERVATOR FOR ALVIE PUCKETT, GLORIA JEAN EVINS v. HELEN PUCKETT, ET AL.

**A Direct Appeal from the Chancery Court for DeKalb County**
**No. 1999-70    The Honorable Vernon Neal, Chancellor**

_____

**No. M2002-02208-COA-R3-CV**

_____

Administrator Ad Litem for estate of deceased-grantor appeals trial court's finding that deceased-grantor was competent at the time he executed a deed of real property to his daughter, and that he was not acting under undue influence at the time of execution. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Gloria Jean Evins of Lebanon for Appellant, Gloria Jean Evins, Administrator Ad Litem

J. Hilton Conger of Smithville for Appellee, Helen Puckett

**OPINION**

This dispute arises from circumstances surrounding a deed of real property. In late January 1989, Mr. Alvie Puckett ("Alvie Puckett"), now deceased, was kicked in the head by a horse and sustained a skull fracture and damage to the frontal lobe of his brain. At the time of the accident Alvie Puckett was 81 years old.

On January 26, 1989, Alvie Puckett was admitted in a comatose state to Vanderbilt University Hospital with an open, depressed, skull fracture and intracerebral hematoma. He underwent a "[l]eft frontal temporal craniectomy for evacuation of [an] intracerebral hematoma."[1]

---

[1] The following additional procedures were performed on Alvie Puckett during his stay at Vanderbilt University Hospital: subdural tap, tracheostomy, gastrostomy, camino ICP monitor placement, central venous line placement, lumbar

(continued...)

The hematoma was successfully removed and over the course of the ensuing weeks Alvie Puckett regained consciousness "to the extent that he could intermittently follow simple commands." Alvie Puckett was discharged from Vanderbilt University Hospital on February 27, 1989. In addition to a skull fracture and intracerebral hematoma, the hospital's discharge summary stated that Alvie Puckett's CT scan revealed two smaller hemorrhages and a "left to right midline shift" of the brain.

In a letter dated February 27, 1989, Dr. Noel Tulipan ("Dr. Tulipan"), the attending physician at Vanderbilt University Hospital, notified Alvie Puckett's regular physician, Dr. Jerry Puckett ("Dr. Puckett"), that he was "somewhat pessimistic regarding Mr. Puckett's overall outcome." Dr. Tulipan noted that Alvie Puckett seemed to be improving, but conceded that it was unlikely that the patient would ever become "functional." Dr. Tulipan further stated that his conclusion was based primarily upon Alvie Puckett's advanced age, and noted that the patient's CT scan "did not reveal any major significant brain damage except around the area of the hematoma which was in the relatively silent frontal lobe." The CT scan apparently revealed a degree of liquefaction in the injured or damaged area.

Upon his discharge from Vanderbilt University Hospital, Alvie Puckett was admitted to NHC Health Care, a nursing home facility, for further care. On March 14, 1989, Alvie Puckett was admitted to DeKalb General Hospital under the care of Dr. Puckett. Alvie Puckett was discharged on March 29, 1989 with a diagnosis of "status post depressed skull fracture," and was ultimately given a "poor prognosis" for recovery by Dr. Puckett.

Over the course of the next few years, several additional CT scans were performed, revealing no significant changes in the physical condition of Alvie Puckett's brain. In or around March 1990, Alvie Puckett presented to Dr. Hugh Don Cripps ("Dr. Cripps") for unspecified reasons not addressed or explained by either party. In a report dated March 15, 1990, Dr. Cripps stated that Alvie Puckett was "severely cognitively impaired," was suffering from progressive dementia, and further described the patient's mental condition as "poor" and "chronic." However, in his deposition testimony, Dr. Cripps stated that his first opportunity to really "look at" Alvie Puckett's mental status was in 1992, when the patient was admitted to DeKalb General Hospital for a delirium reaction. Dr. Cripps testified that Alvie Puckett's delirium was caused by a drug that he was taking for incontinence.

No formal examination of Alvie Puckett's mental capacity or status was undertaken until March 8, 1994. On this date, Dr. Cripps administered a standard geriatric examination, or mini-mental status examination, to Alvie Puckett. Dr. Cripps testified that Alvie Puckett's score on the exam was indicative of severe dementia, and declared Alvie Puckett legally incompetent.

---

[1](...continued)
puncture, electroencephalogram, and a CT scan of the patient's head.

Testimony from family members reveals that Alvie Puckett did not have regular speech patterns after his accident, often answering questions with one word or a short phrase. It is also apparent that Alvie Puckett required assistance in cleaning and feeding himself, and at times suffered from mental confusion. While there appears to be no dispute that Alvie Puckett's mental capacity was negatively effected by his advanced age and the accident, the severity and extent of his decline is disputed.

In the time between Alvie Puckett's accident in January of 1989 and Dr. Cripps' formal examination of his mental status in March of 1994, Alvie Puckett executed several legal documents, including deeds conveying tracts or parcels of real property to his son, daughter, and two grandsons. A brief recitation of the pertinent documents or instruments follows.

On January 28, 1992, Alvie Puckett signed a Power of Attorney naming his daughter, Ms. Helen Puckett ("Helen Puckett"), as his "true and lawful attorney in fact, for me in my name and stead." This instrument was recorded on June 19, 1992. On March 3, 1992, Alvie Puckett and his wife, Wilma Puckett ("Wilma Puckett"), signed a deed conveying a one-acre tract of land to their grandson, Randall S. Puckett ("Randall Puckett"), for and in consideration of the sum of $10.00. Several months later, on July 27, 1992, Alvie and Wilma Puckett signed a deed conveying a one-acre parcel of land to their grandson, Shawn Richard Puckett ("Shawn Puckett") and his wife, Angela Jean Puckett ("Angela Puckett"), for the sum of $10.00.

On November 10, 1992, Alvie and Wilma signed a deed granting to Helen Puckett three tracts of land, the first tract containing approximately 97 acres, the second containing approximately 75 acres, and the third approximately 0.6 acres. This deed, which is at the heart of the controversy in this matter, states in pertinent part:

> FOR AND IN CONSIDERATION of the love and affection we have for our daughter, and for other considerations of value, WE, A.R. PUCKETT and wife, WILMA PUCKETT, have this day bargained and sold, and do hereby transfer and convey unto HELEN PUCKETT, and her heirs and assigns, with both Grantors, A.R. Puckett and Wilma Puckett retaining a life estate in and for the remainder of our natural lives, all of our right, title, estate and interest in and to three certain tracts or parcels of land situated in the old 25th Civil District of DeKalb County, Tennessee....

The deed details the property conveyed, and notes that the one-acre parcels previously conveyed by Alvie and Wilma Puckett to their son Mr. Donald Puckett ("Donald Puckett"), and grandsons Shawn and Randall Puckett, were "included but excluded" from the land deeded to Helen Puckett. Helen Puckett's deed was recorded on April 24, 1993.

In January 1993, upon learning of the Power of Attorney executed by Alvie Puckett approximately one year earlier, Donald Puckett took his father to an attorney to sign an instrument revoking Helen Puckett's Power of Attorney. Helen Puckett's January 28, 1992 Power of Attorney was thereby revoked pursuant to an instrument signed by Alvie Puckett and dated January 8, 1993.

Approximately one month later, on February 15, 1993, Alvie and Wilma Puckett signed a deed conveying to Donald Puckett and his wife, Brenda Puckett, for the sum of $10.00, their "one-half undivided interest"in a one acre tract of land located in DeKalb County, Tennessee. It appears as though Donald and Brenda Puckett held the other one-half undivided interest in said property prior to conveyance.

On March 17, 1994, Donald Puckett filed a "Petition for Appointment of Conservator," seeking the appointment of a conservator for Alvie Puckett on grounds that he "suffered and presently suffers from old head trauma, brain injury, progressive dementia and cognitive impairment causing him to be incompetent physically and mentally." The petition alleges that Wilma and Helen Puckett used anger and criticism to prompt Alvie Puckett to execute the aforementioned deeds and Power of Attorney, and specifically avers that Alvie Puckett was "substantially impaired and probably was incompetent" on November 10, 1992 when he executed Helen Puckett's deed. The petition requests that Donald Puckett or, alternatively, a non-family member, be appointed as conservator to "manage the property of Alvie Puckett." The following day, the trial court entered an order appointing A. Vester Parsley, Jr. ("Mr. Parsley") as guardian ad litem for Alvie Puckett.

Wilma and Helen Puckett filed a joint answer to this petition on April 4, 1994, denying the allegations of wrongdoing and improper influence and further stating that Alvie Puckett was not substantially impaired or incompetent when he executed Helen Puckett's deed. The answer provides that either Wilma or Helen Puckett should be appointed as conservator for Alvie Puckett in the event the court deem such an appointment necessary.

On January 26, 1995, the court entered an agreed order appointing Wilma Puckett as conservator of "the person and property" of Alvie Puckett. Mr. Parsley was appointed special master for the purpose of "inquiring into and/or investigating the validity of any transfer of any interest in realty by Mr. Alvie Puckett which occurred subsequent to his injury of approximately 1989."

Donald Puckett filed a petition to remove Wilma Puckett as conservator for Alvie Puckett on December 31, 1996, alleging that she "failed to perform her duties and obligations in accordance with the law and has failed to acted in the disabled person's best interests...." Wilma Puckett died

on January 14, 1997,[2] and, by agreed order filed May 20, 1997, Ms. Kelly Tayes ("Ms. Tayes") of Upper Cumberland Development District, Office of the Public Guardian ("Upper Cumberland"), was appointed conservator for Alvie Puckett. In October 1997, the court entered an order upon motion by Ms. Tayes, to add Helen Puckett as a party-defendant.

On May 12, 1998, Upper Cumberland filed a complaint for declaratory judgment, naming as defendants Donald Puckett, Brenda Puckett, Helen Puckett, Shawn Puckett, Angela Puckett, and Randall Puckett. The complaint specifically asked the court to determine whether Upper Cumberland had a duty to bring an action against the defendants to set aside the deeds from Alvie and Wilma Puckett to each of the respective parties, and stated in pertinent part:

> 1. . . . Pursuant to the provisions of T.C.A. § 29-14-105, Your Petitioner would pray for a declaration determining whether the Conservator [(Ms. Tayes)] has a duty to bring an action against the above-named Respondents to set aside certain Quitclaim Deeds which transferred real property as set forth below from Alvie Puckett to each of the Respondents....
>
> *****************************************************
>
> 10. Prior to the execution of any of the above documents, in January of 1989, Alvie Puckett suffered a head injury when he was kicked in the head by a mule.[3] Following said head injury, Mr. Puckett experienced a deterioration in his mental and physical capacities. Petitioner has been informed that the deeds referenced above were the result of undue influence exercised over Alvie Puckett and Wilma Puckett by Helen Puckett, and that Alvie Puckett was incompetent to execute said documents. The existence of the unrestricted Power of Attorney created a fiduciary or confidential relationship between Helen Puckett and Alvie Puckett. The existence of such a relationship in this transaction where the dominant party (Helen Puckett) receives a benefit from the weaker party (Alvie Puckett) creates a presumption of invalidity due to undue influence. Petitioner has been informed that Alvie Puckett and Wilma Puckett received no independent advice regarding said transaction in order to enable them to make an informed decision regarding the distribution of their assets.

---

[2] The agreed order states that Wilma Puckett died on January 14, 1997. Upper Cumberland's brief states that Wilma Puckett died on June 17, 1997.

[3] The record indicates that Alvie Puckett was kicked in the head by a horse, not a mule.

11. The Quitclaim Deeds referenced above depleted Alvie Puckett's estate of thousands of dollars of valuable real property.

12. Your Petitioner would request this Honorable Court to make a determination with respect to whether the Conservator has an obligation to bring an action to set aside the above-referenced deeds and revest the property in the estate of Alvie Puckett for his maintenance and welfare; or, in the alternative, seeks a judgment in favor of Alvie Puckett against each of the Respondents for the fair market value of said tracts of land, as the Court may in its discretion deem appropriate....

The court entered an order of declaratory judgment on March 2, 1999, finding that Upper Cumberland had an obligation to bring an action on behalf of Alvie Puckett to set aside the deeds to each of the defendants and to have the property re-vested in "the name of Alvie Puckett for his maintenance and welfare; or, in the alternative, to seek a judgment in favor of Alvie Puckett against each of the [r]espondents for the fair market value of said tracts of land...." On June 25, 1999, Upper Cumberland filed a complaint to set aside the deeds to Donald and Brenda Puckett, Helen Puckett, Randall Puckett, and Shawn and Angela Puckett.

Alvie Puckett died on June 28, 1999. Shortly thereafter, Donald and Brenda Puckett filed a motion to appoint an Administrator Ad Litem to replace Upper Cumberland, noting that the conservator's role ended upon Alvie Puckett's death. The motion requested that Ms. Tayes be appointed to the aforementioned position.

Upper Cumberland filed a response to this motion on July 22, 1999, declining to serve as the Administrator Ad Litem "for the purpose of pursuing the litigation begun as Conservator." On August 16, 1999, Ms. Tayes filed a petition of final accounting of the property under her control and further asked the court to approve the accounting and discharge Upper Cumberland as conservator for Alvie Puckett. The court granted this petition for final accounting and discharge by order entered in January 2000.

On November 15, 1999, Upper Cumberland filed a notice of voluntarily dismissal, dismissing its complaint against the named defendants without prejudice. The court dismissed Upper Cumberland's complaint without prejudice and thereafter entered an order denying Donald and Brenda Puckett's motion to appoint an Administrator Ad Litem.

On January 4, 2000, Donald, Brenda, Shawn, Angela, and Randall Puckett filed a joint motion to alter or amend the trial court's order dismissing Upper Cumberland's action against defendants, specifically asking the court to "reconsider the earlier entered Orders mentioned herein and amend the same to allow the appointment of an administrator ad litem and to not voluntarily dismiss this litigation." A hearing on the motion to alter or amend was held on January 14, 2000.

On February 3, 2000, the trial court filed an order granting the motion to alter or amend, and further finding as follows:

> Therefore, it is ORDERED and ADJUDGED that the previous entered Order regarding Voluntary Dismissal shall be set aside with the causes of action in this case to continue to be litigated until ultimately resolved, and the earlier entered Order denying the appointment of an Administrator Ad Litem shall be set aside and the Court hereby ORDERS that an Administrator Ad Litem be appointed in this cause in order to be substituted as the party plaintiff in place of the Upper Cumberland Development District who was serving as the conservator for Alvie Puckett. The original plaintiff, Upper Cumberland Development District, is hereby allowed to withdraw from serving as the conservator for Alvie Puckett who is now deceased, and shall relinquish the pursuit of this lawsuit to the Administrator Ad Litem that shall be approved by the Court upon Motion.

On May 18, 2000, the court filed an agreed order appointing Ms. Gloria Jean Evins ("Ms. Evins") Administrator Ad Litem on behalf of the estate of Alvie Puckett. Ms. Evins filed a petition on June 21, 2000 asking that she be substituted as party plaintiff and further praying that the "transfer[s] previously described in the original Complaint be set aside and the properties ... included in the Probate Estate of Alvie Puckett, or in the alternative, that a judgment be entered in favor of the Administrator [A]d Litem against each of the Defendants for the fair market value of the tracts of land...."

Helen Puckett filed an answer to this petition on May 31, 2002, denying that a confidential and fiduciary relationship existed between her and Alvie Puckett, and further claiming no knowledge of the January 28, 1992 Power of Attorney until "after the execution of any of the deeds referred to in the complaint."

On June 14, 2002, Donald and Brenda Puckett, Shawn and Angela Puckett, and Randall Puckett filed separate offers of judgment, agreeing to judgments against them "for a release of any claim to the property" titled to the respective defendants. Ms. Evins filed notices accepting each offer of judgment. An agreed order dismissing Ms. Evins's actions against the above-named defendants was entered on October 18, 2002.

A two-day hearing upon Ms. Evins's petition and Helen Puckett's answer was begun on June 24, 2002, and concluded on July 30, 2002. In an order filed August 14, 2002, the trial court found:

> ORDERED and ADJUDGED that the decedent, Alvie R. Puckett, was competent at the time he executed the conveyance from Alvie Puckett and wife, Wilma Puckett, to Helen Puckett on

November 10, 1992, said conveyance being of record in Record Book 31, page 782, Register's Office, DeKalb County, Tennessee, and further, that the said Alvie R. Puckett was not acting under undue influence at the time he executed the deed to Helen Puckett. It is, accordingly,

ORDERED and ADJUDGED that the complaint in this cause is hereby dismissed and the costs of the cause are taxed to the Estate of Alvie R. Puckett.

Ms. Evins filed a timely notice of appeal of the court's August 14, 2002 order, and presents two issues for review, which we restate as follows:

I. Whether the trial court erred in finding that Alvie Puckett was competent at the time he executed the deed to Helen Puckett, "ignor[ing] the unimpeached and uncontradicted testimony" of two experts.

II. Whether the trial court erred in finding that Alvie Puckett was not acting under the undue influence of Helen Puckett on November 10, 1992, when he executed the deed to his daughter.

Helen Puckett raises the additional issue of whether the attorney's fees incurred by Ms. Evins on appeal "should be awarded[,] regardless of the outcome of this good faith appeal."

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

## I.

The first issue on appeal is whether the trial court erred in finding that Alvie Puckett was competent when he executed the deed to Helen Puckett on November 10, 1992.

In *Seat v. McWhirter*, 93 Tenn. 542, 29 S.W. 220, 227 (Tenn. 1894), the Tennessee Supreme Court considered the primary issue of whether Mrs. Seat "was fully capable of understanding and appreciating what she was doing when she made [two deeds conveying approximately $70,000.00 in property to the McWhirters], and did comprehend the nature of the transaction," stating:

The law upon the subject of capacity and undue influence is that where the maker of a voluntary conveyance is capable of doing the act, and there is no fraud, no concealment, and no advantage taken, the court will not interpose. *Hadley v. Latimer*, 3 Yerg. 537; *Coffee*

*v. Ruffin*, 4 Cold. 514. The law does not require that persons shall be able to dispose of their property "with judgment and discretion" in order to the validity of a conveyance. It is sufficient if they understand what they are about. *Paine v. Roberts* (1880) 82 N. C. 453. The fact that grantees advised and encouraged the execution of the voluntary deeds does not impair the validity of the instruments, unless the free agency of the grantor was destroyed. *Stone v. Wilbern*, 83 Ill. 108; Roe v. Taylor, 45 Ill. 485.

In *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291 (Tenn. Ct. App. 2001), the Middle Section of this Court further stated:

The degree of mental capacity required to enter into a contract is a question of law. *Nashville, Chattanooga & St. Louis R.R. v. Brundige*, 114 Tenn. 31, 34, 84 S.W. 805, 805 (1905). Competency to contract does not require an ability to act with judgment and discretion. *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991). All that is required is that the contracting party reasonably knew and understood the nature, extent, character, and effect of the transaction. *Mays v. Prewett*, 98 Tenn. 474, 478, 40 S.W. 483, 484-85 (1897); *In re Estate of Holmes*, No. 02A01-9707-PB- 00158, 1998 WL 134333, at \*3 (Tenn. Ct. App. Mar. 26, 1998) (No Tenn. R. App. P. 11 application filed); *Roberts v. Roberts*, 827 S.W.2d 788, 791-92 (Tenn. Ct. App. 1991). Thus, persons will be excused from their contractual obligations on the ground of incompetency only when (1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) when they are unable to act in a reasonable manner in relation to the transaction, and the other party has reason to know of their condition. Restatement (Second) of Contracts § 15(1) (1981).

All adults are presumed to be competent enough to enter into contracts. *Uckele v. Jewett*, 642 A.2d 119, 122 (D.C. 1994); *Foltz v. Wert*, 103 Ind. 404, 2 N.E. 950, 953 (Ind. 1885). Accordingly, persons seeking to invalidate a contract for mental incapacity have the burden of proving that one or both of the contracting parties were mentally incompetent when the contract was formed. *Knight v. Lancaster*, 988 S.W.2d 172, 177-78 (Tenn. Ct. App. 1998); *Williamson v. Upchurch*, 768 S.W.2d 265, 269 (Tenn. Ct. App. 1988). It is not enough to prove that a person was depressed

[(footnote omitted)] or had senile dementia.[4]  To prove mental incapacity, the person with the burden of proof must establish, in light of all the surrounding facts and circumstances, [**Roberts v. Roberts**, 827 S.W.2d 788, 792 (Tenn. Ct. App. 1991),] that the cognitive impairment or disease rendered the contracting party incompetent to engage in the transaction at issue according to the standards set forth above.  **Butler v. Harrison**, 578 A.2d 1098, 1101 (D.C. 1990); **Weakley v. Weakley**, 355 Mo. 882, 198 S.W.2d 699, 702-03 (Mo. 1947); **see also Woods v. Mutual of Omaha**, No. 02A01-9510-CV-00218, 1996 WL 578489, at *3 (Tenn. Ct. App. Oct. 9, 1996), **perm. app. denied** (Tenn. 1997) (rejecting an affidavit that did not address the party's competency regarding the specific contract at issue).

**Id**. at 297.

The burden of proving that Alvie Puckett was mentally incompetent on November 10, 1992, the date of execution of the deed to Helen Puckett, rests with the Administrator Ad Litem in the present matter.  For the following reasons, we find that Ms. Evins has not carried her burden.  We note, initially, that there is no medical evidence in the record to prove that Alvie Puckett did not reasonably know and understand the "nature, extent, character, and effect" of the deed executed in favor of Helen Puckett.  **See Mays**, 98 Tenn. at 478, 40 S.W. at 484-85; **In re Estate of Holmes**, 1998 WL 134333 at *3; **Roberts**, 827 S.W.2d at 791-92.  The record indicates that no evaluation or examination of Alvie Puckett's mental state was conducted at or near the time of execution of the disputed deed, and further reveals that the only mental examination conducted was performed by Dr. Cripps on March 8, 1994, approximately sixteen months after execution of the deed.

Despite the fact that no mental evaluation or examination was performed on Alvie Puckett at or near the time of execution, Ms. Evins argues that the "unimpeached and uncontradicted" testimony of doctors Cripps and Petrie indicates that the deceased did not have "the mental ability to understand the consequences of, and/or appreciate the significance of, signing a deed on November 10, 1992."  We disagree with Ms. Evins's interpretation or characterization of the doctors' testimony.

In the course of his initial deposition on April 27, 1994, Dr. Cripps testified that he first evaluated Alvie Puckett's mental status on March 8, 1994, using a standard geriatric examination. Dr. Cripps stated that Alvie Puckett's score on the examination was indicative of severe dementia,

---

[4] The court cited to the following cases in support of the position that evidence of senile dementia, alone, is not sufficient to prove lack of testamentary capacity: **Hanks v. McNeil Coal Corp.**, 114 Colo. 578, 168 P.2d 256, 260 (1946); **Street v. Waddell**, 3 S.W.3d 504, 505-06 (Tenn. Ct. App. 1999) (holding that evidence of dementia alone does not prove lack of testamentary capacity).

and further noted that his "gut reaction" was that Alvie Puckett's mental capacity or status had progressively deteriorated since 1991, the first time he saw the deceased as a patient. Dr. Cripps stressed that he had no "objective data" to support this opinion.

During his second deposition on May 2, 2002, Dr. Cripps testified that it was his belief that Alvie Puckett had alzheimer's dementia on top of his brain injury. Dr. Cripps stated that it takes an evaluation and mental status examination to determine if someone is demented, and reiterated that no such evaluation or examination was conducted until 1994. Dr. Cripps further testified that "[d]ementia cannot be deciphered in retrospect," and noted that "trying to say from 1994 what went on from '89 to '94, would be a lot of hazard and guess on anybody's part, whether it is Dr. Petrie's or mine." When questioned specifically as to whether Alvie Puckett could have understood the significance of executing the November 1992 deed, Dr. Cripps testified:

> Q. So given that he was in a coma for at least a week or six days at a minimum, and at the age that he was, and Dr. Tulipan's indication that he expected his prognosis to be fairly poor, do you have an opinion as to whether Mr. Puckett could have from memory repeated to someone a legal description and told them out of what local farm description, such as the Luna farm or something like that, where that property would have come?
>
> A. In what year?
>
> Q. In 1990, let's say.
>
> A. I would just have to say that it would have been – it would have probably been unlikely.
>
> Q. Do you have an opinion as to whether or not he could have understood the significance of signing a deed with a life estate in himself to someone else in between 1989 and 1992?
>
> A. I think he probably would have been able to recognize what property he owned and probably could have told you who he bought it from. I don't think he probably would have been capable of knowing the ramifications of deeding it.
>
> Q. I didn't hear you.
>
> A. I think he probably would have been able to have remembered who he purchased it from, what property he owned. He probably could have remunerated them, but I think if you asked him the question, if you do X, Y, Z, what would be the ramifications of that.

-11-

I don't think he would have been possessed with that kind of reasoning ability.

On examination by Helen Puckett's attorney, Mr. J. Hilton Conger, Dr. Cripps conceded that any opinion as to Alvie Puckett's mental capacity between 1989 and 1994 was speculation, stating:

> Q. Dr. Cripps, we started this discussion about an hour and 40 minutes ago with the proposition that dementia cannot be assessed in retrospect. Is that the statement that you made?
>
> A. Yes.
>
> Q. And we have spent the last hour and 40 minutes trying to do that, have we not?
>
> A. Yes.
>
> Q. So anything that you testified to today about Mr. Puckett's mental capacity between 1989 and 1994 is just speculation on your part today; is that correct?
>
> A. Yes.

Upon examination by Mr. Robert Anderson, attorney for Donald Puckett, Dr. Cripps further testified:

> Q. The term speculation has a lot of significance in law. When you were giving opinions about Mr. Puckett's ability at the time, given the records and given your having treated him, even though there was a gap in your treatment of him, was that an educated opinion, or was that pure speculation?
>
> A. It was an educated opinion, but I feel real uncomfortable trying to guesstimate as to what something was that could be objectively measured. It just makes me a little uncomfortable to guesstimate what it was.
>
> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
>
> Q. You have seen the medical records from 1989 – whenever in late '89 or early 1990 when those records end – is there anything inconsistent with those medical records with the opinions you shared with me saying it was highly unlikely that he could have understood the ramifications of signing those various documents?

A. I don't think there is anything inconsistent.

Q. When counsel asked you is it possible that he could have comprehended and understood the ramifications, for you, what is the difference between answering a question yes, it is possible and for you having said it is very unlikely that he could have? Tell us from your perspective what the difference is.

A. As I look at this, I think he had a brain injury from the result of the horse kicking him and from the high pressure in the brain that caused him to be in the coma. I think he had injuries. The problem – to anybody who's honest and objective about it – there is no way in the world to know what his mental status exam was six months, nine months, after the injury because no one measured it. But I would say he probably had some mental decline as a result of that.

I think some time after that he started developing alzheimer's, and I think that occurred over a slow period of years. The reason it's so – to me, fraught with error trying to guess at it. There is such a wide rate at which people deteriorate with alzheimer's. So it would be – and I can't put a percentage on it, but it could be that he did have knowledge enough to make simple decisions, but I think it's very unlikely that he could have made a complex decision in 1990.

Complex means that he had to take several pieces of information, assimilate it, and come up with a plan of attack.

Q. Such as the questions that I asked you about whether he could understand the ramifications of signing those documents; is that correct?

A. He probably would not have known details of what you've shown me, but it may have been very possible that he would have known he was transferring property and to whom he was transferring the property. He may not have realized – and probably didn't realize – all of the legal ramifications of what he was doing, especially with his wife helping him.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A. ... But in 1991 when I first saw him, he walked in under his own command. I don't even remember if he used a walking stick. He

-13-

would walk in and sit down.  And although his conversation was not a normal conversation, he would answer questions.  And the sad thing is I can't tell you no matter how much I try or how many times you ask me, I can't tell you what his mental status was.

In his deposition, Dr. Petrie testified that he saw Alvie Puckett on October 21, 1996 and, based upon his examination at this time and his review of the deceased's medical records, determined to a "reasonable medical certainty" that Alvie Puckett was not capable of making judgments with regard to the execution of legal documents around 1992.  We quote at length from Dr. Petrie's deposition testimony:

Q.  Now, have you been able to review as many notes as there are available for Mr. Puckett following his release from the hospital?

A.  Yes, and let me say that the one area that I think we lack in looking through the record, would have been a comprehensive assessment where someone would sit down with him on or about the time of some of these – when some of these legal documents were executed, where someone would have said, Mr. Puckett, does he know the month, does he know the date, does he know where he is, how is his judgment, and this, unfortunately, is absent.

*****************************************************

Q.  From your opportunity to see Mr. Puckett in October of '96, and from your review of the records that exist, can you give us an opinion – I'm asking you for an opinion, but can you give us an opinion as to whether or not his abilities to reason and to speak and to understand would have improved sufficiently so that for any activity that he would have been involved in between those two dates, he would have appreciated the effect of his acts? had sufficient intelligence to understand and

A.  Yes, I believe I can.

Q.  What is your opinion?

A.  My opinion is that he would not have been able to understand his actions or the consequences of his actions due to the damage he would have had in his judgment, as well as problems in being able to persist with certain thoughts and other mental functions that would have been necessary for this kind of operation.

Q. Now, is this based on a physiological damage to him, as opposed to someone who is psychotic?

A. Yes. This, in my opinion, is related to the initial injury and a failure of adequate improvement from that injury to allow him to exercise appropriate judgment.

Q. The original injury occurred on January 26, 1989, and I'm being repetitive, and I apologize, but I have a reason for it. Would your opinion that you have now expressed have been the case on August 24th, 1990, some year and seven months after the original injury?

***A. Yes, however let me pose as a caveat the lack of data. I would feel much more comfortable if there had been more data describing his mental functioning in a standardized way, in a way Dr. Cripps did.***

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q. Could in your opinion at any time between January 26, 1989 and the day you saw him in 1996 – in your opinion could Mr. Alvie Puckett guard himself against imposition or resist importunity or undue influence?

A. I believe he could not.

Q. And I may be repetitive with this, and I apologize if I am, but would he be able to understand in a reasonable manner the nature and consequences of any transactions such as a deed, and/or a will?

A. I believe he would not have been.

Q. Would he be able to understand the scope of his holdings as assets?

A. I believe not.

Q. Would he be able to know all of the objects of his affection, meaning people?

A. In my presence he called his – he misrecognized his son, thought he was someone else. That's harder for me to make a judgment of,

-15-

because I think it's best to see patients around family members for a longer period of time. I couldn't answer that one.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[Q.] In 1990, would Mr. Puckett have been able to distinguish and explain where parcels had come from, as to whether they were out of the Potts deed or the Hale deed?

A. Not in my opinion.

Q. And this is based on his physiological damage and loss of brain matter, as opposed to whether or not he is loony?

A. Right. This is not a psychiatric disorder really. This is a neurological impairment.

Q. Now, just for clarity, would he have been able to do so in January – on January 28, 1992?

A. I suspect not.

Q. Why do you say suspect?

*A. Well, once again, I think we're extrapolating back to his state, and judging from the assessments I have seen in the nursing notes and the physician's notes, I see no indication of sufficient improvement to make the kinds of logical requirements that – that would be necessary to make these legal judgments.*

Q. Do you rely on those kinds of notes and records to make assessments?

A. Yes.

Q. Would he have been in a position to do the things that are claimed that he would have done, been able to do supposedly in November, specifically November 10, 1992?

A. I believe not.

(emphasis added).

On cross examination, Dr. Petrie testified:

-16-

Q. The years in question, I believe, Doctor, are [19]90, [19]91, [19]92?

A. Correct.

Q. And according to your testimony today and the – your letter of April 17 [to attorney Robert A. Anderson], we have a critical shortage of medical records for that particular area of time; is that correct?

A. Right.

Q. In your letter of April 17 you indicated in the first paragraph on page two, unfortunately a complete evaluation of the patient's mental abilities was never clearly performed and as is clearly the case in the medical records?

A. Yes.

Q. Again in the third paragraph of that same letter, page two, the medical record is lacking as noted in clear and comprehensive descriptions of Mr. Puckett's status throughout the years when the will was executed, and not only the will, but the dates that Mr. Anderson referred to, January 28, 1992 and November 10, 1992.

Then you summarized by saying in the last paragraph, the assessment of the patient's cognitive status in 1991 and [19]92 by objective personnel by nurses and others would be extremely helpful in support of this position, and we just don't have that, do we, Doctor?

A. Right.

In a second letter to Mr. Anderson dated April 25, 1996, Dr. Petrie stated:

As I stated before, I believe Mr. Puckett suffered from a traumatic dementia – a substantial loss of brain cells – from a kicking injury exacerbated by his age and other medical conditions. As such, he had lost the ability to perform complex verbal skills or sophisticated legal negotiations – exactly the kind that would have been necessary for him to execute the will in question. I do not believe he understood the nature of the deeds or the concept of deeding away the title while keeping the right to live on his property. Although of course I did not see Mr. Puckett, I can only infer from the data presented that this

would have had to be presented to him by someone else, and that he simply assented or signed the document without conceiving the meaning of this document. In addition, I do not believe he could read a legal document without guidance or direction to provide a reasoned sense of which property belonged with whom and what effect this action would have on his family. I do not believe he could have verbalized complex instructions. Again, I suspect he would have responded to direction from others. As I have mentioned previously, I am only inferring these facts from the substance of the report on Mr. Puckett, the lack of any sense of improvement from his prior pathological state, and the profound injury which he sustained to his brain.

Based upon our review of all of the expert testimony in the record, and the record as a whole, we find no evidence to preponderate against the trial court's finding that Alvie Puckett was competent at the time of his execution of the deed to Helen Puckett. To briefly reiterate, Dr. Cripps acknowledged that his opinions as to Alvie Puckett's mental capacity on November 10, 1992 were mere speculation based on an educated opinion. Although Dr. Petrie was more certain in his opinion that Alvie Puckett lacked the necessary competency to execute the deed to Helen Puckett, he noted that he "did not see Mr. Puckett, [and therefore could] only infer from the data presented that [the will and deeds] would have had to be presented to him by someone else, and that he simply assented or signed the document without conceiving the meaning of this document." As to the sufficiency of the available data, Dr. Petrie conceded that "the medical record is lacking as noted in clear and comprehensive descriptions of Mr. Puckett's status throughout the years when the will was executed, and not only the will, but the dates that Mr. Anderson referred to, January 28, 1992 and November 10, 1992," and further noted that he "would feel much more comfortable if there had been more data describing his mental functioning in a standardized way, in a way Dr. Cripps did." In light of the experts' testimony and the fact that no mental examination was conducted regarding Alvie Puckett's mental capacity at or near the time of execution of the November 10, 1992 deed to Helen Puckett, we find that the record does not contain sufficient proof to demonstrate that Alvie Puckett did not know or understand the nature, extent, character, and effect of the transaction. We therefore affirm the trial court's finding of competency.

As a final note we briefly consider that Donald and Shawn Puckett both testified that Alvie Puckett was not competent to execute the deed to Helen Puckett on November 10, 1992. Despite their concerns and allegations of incompetence, Donald and Shawn Puckett both willingly, and seemingly without hesitation, accepted deeds from Alvie Puckett shortly before and after November 10, 1992. Moreover, Donald Puckett convinced or persuaded Alvie Puckett to sign an instrument revoking Helen Puckett's Power of Attorney, despite acknowledging that he did not believe that Alvie Puckett knew the consequences or effects of a revocation. In contrast to Donald and Shawn's allegations of incompetence, Mr. William F. Dyer ("Mr. Dyer"), the attorney who drafted and notarized the deed to Helen Puckett, testified that he had known the deceased for approximately 40

years and, in his opinion, both Alvie and Wilma Puckett were competent when they signed the deed and were aware of its contents.

When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. Sp. Workers Comp. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*.; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). The trial court apparently attributed little weight or credibility to Donald and Shawn Puckett's testimony regarding Alvie Puckett's alleged incompetency and, because we find no evidence in the record to preponderate against the trial court's conclusion, we are unwilling to disturb this finding.

## II.

The second issue on appeal is whether the trial court erred in finding that Alvie Puckett was not acting under the undue influence of Helen Puckett on November 10, 1992, when he executed the deed to his daughter. The trial court specifically found that no confidential relationship existed between Helen Puckett and Alvie Puckett, noting that Helen was not aware of the deed until April 24, 1993.

Under Tennessee law, "[a] person authorized to act on behalf of another by virtue of an unrestricted power of attorney has [a] confidential relationship with [the] person who executed the power of attorney." *See Crain v. Brown*, 823 S.W.2d 187, 194 (Tenn. Ct. App. 1991) (citing *Mitchell v. Smith,* 779 S.W.2d 384 (Tenn. Ct. App. 1989)). Furthermore, the existence of a confidential relationship followed by a transaction wherein the dominant party receives a benefit from the other party creates a presumption of undue influence which be rebutted only by clear and convincing evidence of the fairness of the transaction. *See Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995). "To prove the fairness of the transaction, the dominant party may show that the weaker party received independent advice before engaging in the transaction that benefitted the dominant party." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (citing *Hogan v. Cooper*, 619 S.W.2d 516, 519 (Tenn.1981); *Richmond v. Christian*, 555 S.W.2d 105, 107-08 (Tenn.1977) (proof that the donor received independent advice respecting the consequences and advisability of the gift) (citations omitted)).

In *Childress*, the Tennessee Supreme Court clarified that an "unexercised power of attorney does not in and of itself create a confidential relationship," stating:

> The issue of undue influence should "be decided by the application of sound principles and good sense to the facts of each case." *Id*. at 388 (quoting *Halle v. Summerfield*, 199 Tenn. 445, 454,

287 S.W.2d 57, 61 (1956)). A careful reading of ***Matlock*** and ***Mitchell*** shows that an unexercised power of attorney does not in and of itself create a confidential relationship and we clarify ***Matlock*** to the extent it suggests otherwise. The core definition of a confidential relationship requires proof of dominion and control. ***Matlock***, 902 S.W.2d at 385-86; ***Mitchell***, 779 S.W.2d 384 at 389. When an unrestricted power of attorney is executed but has not yet been exercised, good sense dictates that there exists no dominion and control and therefore no confidential relationship based solely on the existence of the power of attorney. In ***Matlock***, there was additional evidence of dominion and control based upon the attorney-client relationship and the personal execution by the attorney of the will and the power of attorney. ***Matlock***, 902 S.W.2d at 385-86. In ***Mitchell***, the niece acted as caretaker to her ailing uncle, chose an attorney for him, drove her uncle to the attorney's office where he signed the power of attorney and will in her van, and began exercising her power of attorney before her uncle's death. ***Mitchell***, 779 S.W.2d at 386-87.

74 S.W.3d at 329.

To briefly reiterate, Alvie Puckett executed a Power of Attorney authorizing Helen Puckett to act on his behalf on January 28, 1992. This instrument was recorded on June 19, 1992. On November 10, 1992, Alvie and Wilma Puckett executed the disputed deed to Helen Puckett. The deed was recorded on April 24, 1993. On January 8, 1993, Alvie Puckett signed a document revoking the Power of Attorney he granted to Helen Puckett.

Ms. Evins concedes that there is no direct evidence of undue influence in the record; instead, she relies upon the allegations of Donald, Shawn, and Brenda Puckett that Helen Puckett used threats to control her parents as the basis for her argument that Helen Puckett unduly influenced Alvie Puckett into executing the November 10, 1992 deed.

Donald, Brenda, and Shawn Puckett all testified that they heard or witnessed Helen Puckett make threats to move out of Alvie and Wilma Puckett's home in an attempt to force compliance with her demands. However, neither Donald, Brenda, or Shawn Puckett ever heard Helen Puckett make threats in connection with the November 10, 1992 deed or the Power of Attorney, and Donald and Shawn Puckett both conceded that they are not aware of any specific instances of undue influence exerted by Helen Puckett over the deceased. Shawn Puckett further noted that the threats that he heard were not made until well after the November 10, 1992 deed was executed. When questioned regarding specific instances of undue influence or pressure, Brenda Puckett stated:

> Q. And as far as any undue influence or pressure that Helen may
> have put on them, you've told us that you can't testify that she

pressured Mr. Puckett into signing [the November 10, 1992 deed]; can you?

A. No, not that document. No.

Q. Or any other legal document for that matter; can you?

A. No, the legal documents wasn't [sic] done in front of me. I heard some pressure remarks from her at different times.

Q. At different times, but never in connection with signing a legal document?

A. Well, I didn't know the deeds were done exactly at what time, so I don't know whether it was or not.

Moreover, Donald and Brenda Puckett both testified that Alvie Puckett was a stubborn man, and noted that it was difficult to get the deceased to do something against his will. Donald Puckett further testified that Wilma Puckett was the most likely family member to be able to persuade or influence Alvie Puckett's decision making, although he "guessed" that his sister also had some influence over the deceased. Helen Puckett denied any allegations of overreaching, and further averred that she never attempted to influence Alvie Puckett to execute any legal document in her favor.

We note that the proof in the record is uncontradicted that Helen Puckett did not know of the November 10, 1992 deed until April 24, 1993, the day it was recorded. Moreover, there is no proof in the record to refute Helen Puckett's averments that she did not sign any legal document on behalf of Alvie Puckett by virtue of the authority of the Power of Attorney. Although his memory of the events surrounding the November 10, 1992 deed was somewhat fuzzy, Mr. Dyer testified that he did not suspect or perceive any evidence of undue influence on Helen Puckett's behalf, and noted that Alvie and Wilma Puckett did what they wanted with regard to this deed.

In specific consideration of the above facts, and the entire record in this matter, we find that there is no basis for finding that a confidential relationship existed between Helen and Alvie Puckett to give gave rise to a presumption of undue influence. To the extent that appellant's issue could be interpreted as raising allegations of undue influence against Wilma Puckett, we note that there is no evidence in the record to support such an argument. We therefore affirm the trial court's finding that Alvie Puckett was not acting under the undue influence of Helen Puckett on November 10, 1992, when he executed the deed to his daughter.

### III.

Helen Puckett raises the following additional issue for review, as stated in her brief:

Whether the reasonable attorney's fees of the Administratrix ***ad litem*** in [pursuit of] this appeal should be awarded regardless of the outcome of this good faith appeal.

Upon review of Ms. Evins's briefs to this court, we find no argument or specific request for an award of attorney's fees incurred on appeal. To this extent, we find Helen Puckett's issue to be moot. In the event that Ms. Evins could be found to have properly requested an award of attorney's fees incurred on appeal, we find, based on our discussion, ***supra***, that appellant is not entitled to an award of attorney's fees for her appeal in this matter.

## IV.

In conclusion, we affirm the trial court's final order filed August 14, 2002. Costs of this appeal are assessed against the appellant, Gloria Jean Evins, Administrator Ad Litem for the estate of Alvie Puckett, and her surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.