# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### JANUARY 26, 2011 Session

## MARTHA DUKE, As Next of Kin of William Jerry Duke, Deceased, and on behalf of the wrongful death beneficiaries of William Jerry Duke v. KINDRED HEALTHCARE OPERATING, INC., ET AL.

### Direct Appeal from the Circuit Court for Carroll County
### No. 07-CV-83     C. Creed McGinley, Judge

---

### No. W2010-01534-COA-R3-CV - Filed March 14, 2011

---

This appeal involves an arbitration agreement that was executed when a patient was admitted to a nursing home. The arbitration agreement was signed by the patient's sister, who had presented a power of attorney document to the admissions staff that designated her as the patient's attorney-in-fact. The patient's representative in this lawsuit contends that the patient was incompetent when he executed the power of attorney document, and therefore, the sister lacked authority to sign the arbitration agreement on his behalf. The trial court found by clear and convincing evidence that the patient was incompetent when he signed the document and denied the defendants' motion to compel arbitration. We affirm and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

F. Laurens Brock, David J. Ward, Chattanooga, Tennessee, for the appellants, Kindred Healthcare Operating, Inc., et al

Cameron C. Jehl, Deborah Truby Riordan, Carey L. Acerra, Tammera Harrelson, Little Rock, Arkansas, for the appellee, Martha Duke As Next of Kin of William Jerry Duke, Deceased, and on behalf of the wrongful death beneficiaries of William Jerry Duke

## OPINION

### I. FACTS & PROCEDURAL HISTORY

William Jerry Duke ("Mr. Duke") suffered from Alzheimer's disease. He sometimes became violent because he did not recognize his family members. On December 3, 2005, Mr. Duke held a gun to the head of his wife of thirty years and threatened to kill her. Mrs. Duke called the sheriff's department, and Mr. Duke was taken to the local emergency room by sheriff's deputies. While at the emergency room, Mr. Duke assaulted a deputy and ran out of the hospital. After being apprehended and examined, Mr. Duke was involuntarily admitted to a geriatric psychiatric unit at Nashville Rehabilitation Hospital.

On December 21, 2005, while still in the psychiatric unit, Mr. Duke signed a document entitled "General Durable Power of Attorney," naming his sister, Linda Wright, as his attorney-in-fact. The document was notarized by an employee of the Nashville Rehabilitation Hospital. Later that day, Mr. Duke was discharged from the psychiatric unit to go home with his family, despite his physician's recommendation that he needed to be in a locked assisted living placement.

After returning home, Mr. Duke continued to run away and to hallucinate. He was readmitted to the geriatric psychiatric unit on January 7, 2006. Mr. Duke was apparently unable to stay there due to issues involving his insurance, and he was transferred to Huntingdon Health and Rehabilitation Center ("the Nursing Home") on February 10, 2006.

Mr. Duke's sister, Linda Wright, signed the admissions documents to admit Mr. Duke to the Nursing Home, representing that she was authorized to do so pursuant to the power of attorney that Mr. Duke had executed in December of 2005. During the admissions process, Ms. Wright signed an Alternative Dispute Resolution Agreement.

In 2007, Mrs. Duke filed a complaint on behalf of Mr. Duke, then deceased, against the Nursing Home and its owners, operators, and administrator, setting forth various causes of action based upon alleged abuse and neglect by the Defendants. The Defendants filed a motion to compel arbitration and to stay the proceedings, based upon the ADR Agreement signed by Ms. Wright on behalf of Mr. Duke as his attorney-in-fact. In response, Plaintiff argued, among other things, that Ms. Wright was not authorized to execute the ADR Agreement because Mr. Duke was incompetent when he signed the power of attorney.

The trial court heard live testimony from Mrs. Duke and from Ms. Wright, and numerous depositions and exhibits were introduced as well. Ms. Wright testified that Mr. Duke had been diagnosed with Alzheimer's disease about two years prior to his admission

to the Nursing Home. She testified that he would run away from home and get lost while driving. Ms. Wright testified that Mr. Duke had been unable to use the telephone for about six months. She described instances in which Mr. Duke physically threatened his wife and daughter because he did not recognize them. Ms. Wright said that Mr. Duke also would hallucinate, believing that he had seen and spoken to his deceased mother.

Ms. Wright described the psychiatric unit where Mr. Duke was placed as a "lock down unit," where Mr. Duke was locked in for his safety and visitors were subject to restrictions. She said that when she and Mrs. Duke went to visit Mr. Duke, he would look at them but seemed to be "looking through" them. She said that Mr. Duke would smile and say "yes" in response to their questions, but that he was unable to carry on a meaningful conversation. According to Ms. Wright, one of Mr. Duke's doctors told her that someone needed to obtain power of attorney because Mr. Duke was unable to make decisions for himself. Ms. Wright said she did not discuss the issue with Mr. Duke because he would have been unable to understand her.

Ms. Wright testified that she went home and typed up a power of attorney document for Mr. Duke by copying the language of a power of attorney document that had been prepared for her by an attorney to name her daughter as her attorney-in-fact. Ms. Wright testified that she had previously had a conversation with Mr. Duke, soon after he was diagnosed with Alzheimer's disease and started losing his memory, during which she recommended that Mr. Duke "make a power of attorney" and "get [his] business straight." However, she said that Mr. Duke had not taken any action regarding a power of attorney.[1]

During Ms. Wright's next visit to the psychiatric unit, on December 21, 2005, she obtained Mr. Duke's signature on the power of attorney document. She testified that Mr. Duke was unable to carry on a meaningful conversation with her or with Mrs. Duke that day, and that he was irritated because he thought that someone had stolen $500 from him. Ms. Wright testified that Mr. Duke did not have $500 to begin with, but that she and Mrs. Duke gave him five $1 bills, which made him happy because he could not tell the difference and he believed that he had his money back.

Regarding the power of attorney document, Ms. Wright testified that she told Mr. Duke that he needed to sign a paper for her so that he could get medical care, get well, and

---

[1] On cross-examination, Ms. Wright acknowledged that during her deposition, she had testified that Mr. Duke had told her "for years" that he wanted her to serve as his power of attorney. Ms. Wright then attempted to explain that Mr. Duke had not asked her to be power of attorney and that she was the one who suggested that he get his business in order. Ms. Wright later said, "I don't have the best memory in the world. I'm 67 years old."

go home, and she told him that the paper would allow her to communicate with his doctors about his medicine. Ms. Wright testified that Mr. Duke responded, "okay." According to Ms. Wright, the hospital employee who was also a notary came into the room while Mr. Duke was eating lunch, and Ms. Wright helped Mr. Duke to sign his name on the power of attorney document. Ms. Wright said that the notary then notarized the document without asking any questions. She testified that Mr. Duke did not appear to know what he was signing, and she said that she knew that he was incompetent, as he did not recognize her. Ms. Wright testified that Mr. Duke did not read the document and that he would not have known if she had discussed the specifics of the document with him.

Ms. Wright explained that Mr. Duke was discharged from the psychiatric unit later that day, which was December 21, because it was near the holidays and the family was hopeful that they could take care of him at home because his medications had been changed.[2] However, she said that Mr. Duke continued to run away and did not know that he was at home, so he was readmitted on January 7, 2006.

Mrs. Duke testified at the hearing as well. Like Ms. Wright, Mrs. Duke testified that Mr. Duke did not understand what was happening on the day when he signed the power of attorney. Mrs. Duke testified that Mr. Duke did not read the power of attorney document and that he was not able to read at that time. Mrs. Duke acknowledged that during her deposition, she had testified that Mr. Duke did read the power of attorney document. At the hearing, she said she did not know why she had said that at her deposition unless it was because she was nervous and afraid of getting Ms. Wright in trouble.

Mrs. Duke went on to testify that Mr. Duke was not competent when he was admitted to the psychiatric unit, and she further stated that he did not become competent at any point after that. Counsel for the Defendants then questioned Mrs. Duke about her deposition testimony, where she had stated that when Mr. Duke was admitted to the Nursing Home on January 7, 2006, he was mentally "with it" that day and able to understand her. Mrs. Duke then attempted to clarify her answer to mean that Mr. Duke was happy and excited to be out of the hospital when he was admitted to the Nursing Home, and she said that she was not saying that Mr. Duke was mentally competent that day.

During her deposition, Mrs. Duke had also testified that after Mr. Duke was admitted to the psychiatric unit the first time, he had asked Ms. Wright to have a power of attorney document drawn up so that he could sign it the next time Ms. Wright came to visit. When she was questioned about this testimony during the hearing, Mrs. Duke denied that Mr. Duke

---

[2] When Mr. Duke left the psychiatric unit, he was taking an antidepressant, an antipsychotic medication, and perhaps another medication to treat Alzheimer's disease.

had asked Ms. Wright to be his power of attorney in December of 2005. She said that she was nervous during her deposition and must have been wrong.

The notary who was present when Mr. Duke signed the power of attorney testified by deposition. She was employed in the human resources department of Nashville Rehabilitation Hospital. The notary began by stating that she had racked her brain trying to remember Mr. Duke, and that she did remember notarizing a document for an elderly gentleman early one morning when there were two women in the room, although she could not describe their appearance or recall whom the women were. The notary testified that she could not say for certain that the gentleman she recalled was Mr. Duke, but she said she was "pretty sure" it was him.

On the occasion that the notary recalled, the nurse manager had called her up to the psychiatric unit to notarize a document. The notary testified that whenever she would go to the unit to notarize something for a patient, she would generally ask the nurse manager or a physician whether the patient was coherent enough to understand what he or she was signing, and if the response was no, she would not notarize the document. The notary testified that on this particular occasion that she recalled, she did not speak to the patient's physician. She initially said that on this occasion, she asked the nurse manager whether the patient was coherent and that she was told that he was, but she then clarified that this was typically what happened when she notarized a document rather than something that she recalled in this particular instance.

The notary did remember that on the occasion she recalled, she entered the patient's room and asked the two women to leave the room, which they did. She said that she then asked the patient if he knew what he was signing, and that he said yes, that it was his power of attorney. However, the notary later testified that the patient's only responses to her questions were "yes" or "okay." She said she did not ask the patient any test questions or memory tests, such as regarding the day or year or current president. The notary described the patient as "a nice man, he was pleasant, calm, he smiled at me. Looked like he was a little shaky. Maybe even a little bit off balance." However, she said that he did not appear to hallucinate or engage in any behavior that would lead her to believe that he was mentally incompetent. The notary testified that the patient looked at the document but that she did not know whether he read it. Nevertheless, she testified that she believed at the time that the patient knew that he was signing a document that would allow someone else to make decisions on his behalf. The notary recalled that the patient had a hard time writing his name and that she had to hold the clipboard for him. She said the two women came back into the room after the patient signed the document.

Dr. John Cain, II testified by deposition as well. Dr. Cain had treated Mr. Duke during a portion of his second admission to the psychiatric unit at Nashville Rehabilitation Hospital. Dr. Cain had taken over the care of Mr. Duke from his previous treating psychiatrist on January 21, 2006, when Dr. Cain was hired as director of the psychiatric unit. Dr. Cain noted at the outset of his deposition that he did not have any independent recollection of Mr. Duke prior to reviewing his medical records, and that although the medical records had refreshed his recollection to some degree, he was still not able to recall every detail.

Dr. Cain had not treated Mr. Duke during his first admission to the psychiatric unit, but he had reviewed medical records from that admission. Dr. Cain testified that Mr. Duke's mental state at the time of the first admission was "obviously very confused," and that the previous psychiatrist's initial assessment of Mr. Duke's function was "a 15 out of a possible 100, which is severely or catastrophically impaired." Dr. Cain testified that Mr. Duke's score on the assessment of function at discharge was 35 out of 100, "showing some improvement but still severely impaired." Dr. Cain also estimated that the highest level of function that Mr. Duke had attained in the past year was about 35 out of 100.[3]

Dr. Cain described Mr. Duke's diagnosis as "senile dementia, Alzheimer's type, with psychosis and disturbance of behavior with post-traumatic stress disorder," but he noted that Mr. Duke had also had a stroke at some point which may have contributed to his problems. He stated that from reviewing the medical records from Mr. Duke's December 2005 stay at the psychiatric unit, Dr. Cain's overall sense was that Mr. Duke's cognitive status was "very impaired" and that his cognitive abilities would probably put him in the late-moderate to early-severe level of dementia. Dr. Cain said that Mr. Duke was having aggressive outbursts and was very confused, with impaired speech, impaired short term memory, impaired ability to concentrate, and impaired "executive functioning," which he described as "the ability to just stay organized and understand what is going on around him." Dr. Cain also testified that Mr. Duke was experiencing some physical symptoms due to his illness, which demonstrated the severity of his neurologic problems.

Mr. Duke had undergone a "Mini Mental Status Exam" during both of his admissions to the psychiatric unit. During his first admission in December of 2005, Mr. Duke scored a 14 out of 30, which Dr. Cain described as a low score indicative of cognitive impairment. Mr. Duke was able to identify the state, county, and town where he was located. However, he did not know the year, month, day, or date, he could not identify the hospital where he was

---

[3] Dr. Cain later explained that a global assessment of functioning score could vary plus or minus 10 percent depending on the psychiatrist. But, he stated that even if we were to assume that Mr. Duke's score was actually 10 percent higher, "we're still looking at pretty severely impaired."

located, and he could not repeat the phrase "no ifs, ands, or buts" or write a sentence of his own choice. When Mr. Duke took the Mini Mental Status Exam again during his second admission, in January, he scored a 6 out of 30, and he had no idea where he was. The records indicated that nurses had attempted to administer the test to Mr. Duke on two previous occasions, but they noted that he was unable to participate due to his advanced dementia.

Dr. Cain testified that Mr. Duke was aggressive with other patients at the psychiatric unit, and he said that Mr. Duke was having incidents of hallucination throughout his stay. For example, he recalled an incident in which Mr. Duke believed that he had been kidnapped by a nun during the night and raped, and he said that Mr. Duke would sometimes respond to dogs that were not there, or pick at imaginary bugs in the air.

In summary, Dr. Cain testified that Mr. Duke was "a very severely cognitively impaired gentleman," and Dr. Cain said that he would not want Mr. Duke to be making important decisions for himself. Dr. Cain explained that Mr. Duke's cognitive impairment, paranoia, and depression all impacted his ability to make important decisions. He reiterated that Mr. Duke "could not recall information from moment to moment" and that he inaccurately filled in the gaps in his own speech. Dr. Cain testified that based upon his review of the medical records and subsequent treatment of Mr. Duke, it did not appear that Mr. Duke was competent during the December 2005 admission to the psychiatric unit, or that he would have been able to make his own decisions. After reviewing the power of attorney document signed by Mr. Duke on December 21, 2005, Dr. Cain testified that he did not think that Mr. Duke would have been able to understand what he was signing:

> Q. With the records that you have reviewed in this matter and your treatment of Mr. Duke, do you think Mr. Duke would have been able to understand what he was signing here, if he, indeed, did sign this General Durable Power of Attorney?
> A. I don't think so. I am much more certain that when I saw him he couldn't understand this. I don't see how, even with the fluctuations in his cognitive abilities, that he could have really understood this a month earlier. Like I said, I am much more comfortable on the time that I saw him.
> Q. Sure.
> A. No, I don't think he could.
> Q. With regard to the December '05 stay, could you say more likely than not he would not have been competent to sign that document?
> A. Yes, I think that's a pretty fair statement.

On cross-examination, Dr. Cain conceded that he was not aware of the circumstances surrounding the execution of the power of attorney and that he did not know whether Mr. Duke asked any questions or appeared to be hallucinating at the time. As such, Dr. Cain stated, he could not comment on Mr. Duke's "state of mind" or specific cognitive abilities at the exact time that he executed the power of attorney. When asked whether, in general, a patient suffering from Alzheimer's-type dementia is capable of having lucid moments, Dr. Cain responded:

> . . . I think that the concise answer is certainly. But there is a limit, and the problem with Alzheimer's disease is that we take a normal variation in scale. I have better moments during the day than others. We take that normal variation and push it way down the scale, so that the best moments are, you know, not as good as they were . . . .
> So I think there is a, there is a relative issue here. How lucid. The best score we were able to get on this particular patient was a 14. . . . .
> But in this particular patient, in hindsight, looking at his behavior, looking at his ability to interact with people around him and consistently conform his behavior to acceptable standards, I don't think in hindsight he was competent. . . .

Dr. Cain conceded that he was unable to say to a reasonable degree of medical certainty that Mr. Duke was incompetent on December 21, 2005, when he signed the power of attorney. He stated, "I can't say if he was competent or not. But my sense is that he was not." Dr. Cain went on to state that Mr. Duke was quite mentally impaired in December of 2005 and that, more likely than not, he did not have the ability to understand the power of attorney document when he signed it.

Portions of Mr. Duke's medical records were also admitted. Two "Progress Notes" were recorded on December 21, 2005, which is the date when Mr. Duke signed the power of attorney. The first note, from 4:45 a.m., reads as follows:

> Slept 4-5 hrs. Pt became agitated at around 2215, pt slamming his hand on the nurses station, pt upset about not able to leave. Pt cannot comprehend and has no insight as to where he is, or why he is here. Pt medicated . . . at 2230 due to his agitation and also noted him making bizarre footsteps on the floor tiles. Pt. able to rest + calm down. . . .

The second note, from 1:45 p.m., appears to read:

> Mr. Duke was up at the beginning of the shift. He is alert, oriented to person,[4] knows he is in hospital – not name or date. His affect is confused but bright – smiles. He is calm. He walks around unit – visits [with] peers or staff particularly when others initiate conversation. He exhibits no paranoia, no agitation. He is cooperating [with] medication and care. Family here this AM to talk with [illegible] and also complete HCPOA document. Pt discharged home [illegible] family @ 120. . . .

The "Discharge Summary" prepared by Mr. Duke's treating psychiatrist at the time states that the family wanted to try to take the patient home despite her recommendation that he needed to be placed in a locked assisted living placement.

After considering all the evidence, the trial court found by clear and convincing evidence that Mr. Duke was not competent to execute the power of attorney on December 21, 2005. Accordingly, the court held, the power of attorney was invalid, and Ms. Wright lacked authority to bind Mr. Duke to the ADR Agreement that she signed. Therefore, the court denied the Defendants' motion to compel arbitration. The Defendants timely filed a notice of appeal.

## II.   ISSUES PRESENTED

The Defendants present the following issues, as we perceive them, for review:

1.  Whether the trial court erred in finding that clear and convincing evidence demonstrated that Mr. Duke was incompetent when he signed the power of attorney; and

2.  Whether the trial court erred in "looking behind" the power of attorney document to consider whether Mr. Duke was competent to execute it.

---

[4] Dr. Cain explained what it means to be, for example, "oriented times one, two, three, or four" or "oriented to person" as follows:

> It's a thing we look for, does the person recognize who they are, respond to their name, know who we're talking about. Do they recognize the place, kind of general timing, and the situation. If you come to the hospital but think you are there for a meal, then you are not oriented to the situation. So oriented times four would be good, oriented to person is pretty primitive. Because kids, at two, are oriented to person.

For the following reasons, we affirm the decision of the circuit court and remand for further proceedings.

### III. STANDARD OF REVIEW

The mental capacity required to execute a general durable power of attorney is essentially the same as and equates to the mental capacity required to enter into a contract. *In re Conservatorship of Davenport*, No. E2004-01505-COA-R3-CV, 2005 WL 3533299, at *17 (Tenn. Ct. App. Dec. 27, 2005) (citing *In re Armster*, No. M2000-00776-COA-R3-CV, 2001 WL 1285904, at *7 (Tenn. Ct. App. Oct. 25, 2001)). The degree of mental capacity required to enter into a valid contract is a question of law. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001) (citing *Nashville, Chattanooga & St. Louis R.R. v. Brundige*, 84 S.W. 805, 805 (Tenn. 1905)). However, whether a party possessed the required degree is a question of fact. *Dickson v. Long*, No. M2008-00279-COA-R3-CV, 2009 WL 961784, at *3 (Tenn. Ct. App. Apr. 8, 2009) (citing *Waller v. Evans*, No. M2008-00312-COA-R3-CV, 2009 WL 723519, at *3 (Tenn. Ct. App. Mar. 17, 2009); *Brundige*, 84 S.W. at 805). "All adults are presumed to be competent enough to execute contracts." *Rawlings*, 78 S.W.3d at 297. Accordingly, the party attempting to invalidate a contract due to mental incapacity bears the burden of proof, and the proof must be clear, cogent, and convincing in order to set the contract aside. *In re Armster*, 2001 WL 1285904, at *8. "'Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.'" *Milligan v. Bd. of Prof'l Responsibility*, 301 S.W.3d 619, 630 (Tenn. 2009) (quoting *Hughes v. Bd. of Prof'l Responsibility*, 259 S.W.3d 631, 642 (Tenn. 2008)). Although the clear and convincing standard is more exacting than the preponderance of the evidence standard, it does not require such certainty as the beyond a reasonable doubt standard. *Id.*

### IV. DISCUSSION

#### A. Mr. Duke's Alleged Incapacity

In order to resolve the issue before us, we must consider Mr. Duke's mental capacity at the moment of execution of the document. *See In re Armster*, 2001 WL 1285904, at *8 (citing *Harper v. Watkins*, 670 S.W.2d 611, 629 (Tenn. Ct. App. 1983)).

> Competency to contract does not require an ability to act with judgment and discretion. *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991). All that is required is that the contracting party reasonably knew and understood the

nature, extent, character, and effect of the transaction. *Mays v. Prewett*, 98 Tenn. 474, 478, 40 S.W. 483, 484-85 (1897); *In re Estate of Holmes*, No. 02A01-9707-PB-00158, 1998 WL 134333, at *3 (Tenn. Ct. App. Mar. 26, 1998) (No Tenn. R. App. P. 11 application filed); *Roberts v. Roberts*, 827 S.W.2d 788, 791-92 (Tenn. Ct. App. 1991). Thus, persons will be excused from their contractual obligations on the ground of incompetency only when (1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) when they are unable to act in a reasonable manner in relation to the transaction, and the other party has reason to know of their condition. *Restatement (Second) of Contracts* § 15(1) (1981).

*Rawlings*, 78 S.W.3d at 297. "It is not enough to prove that a person was depressed or had senile dementia. To prove mental incapacity, the person with the burden of proof must establish, in light of all the surrounding facts and circumstances, that the cognitive impairment or disease rendered the contracting party incompetent to engage in the transaction at issue according to the standards set forth above." *Id.* (citations omitted).

On appeal, the Defendants contend that the evidence in this case did not clearly and convincingly establish that Mr. Duke was incompetent when he signed the power of attorney. As support for their argument, they first point to the deposition testimony of the notary. Again, the notary did initially testify that when she asked the patient if he knew what he was signing, he said yes and that it was his power of attorney. However, she later said that the patient only responded with a "yes" or "okay" in response to her questions. She also initially testified that the nurse manager told her that this patient was "with it" or coherent, but later, she clarified that this was typically what happened when she notarized a document rather than something that she recalled in this particular instance. The notary also testified that she had no concerns regarding the patient's competency and that she believed at the time that he understood what he was signing. She also testified, however, that she did not know whether the patient read the document, and that she did not ask him any questions to test his competency. Thus, we do not find the notary's testimony to be as persuasive as the Defendants suggest.

We also note that the notary could not say for certain whether the gentleman she recalled was in fact Mr. Duke, and her testimony about the circumstances surrounding the patient's execution of the document conflicted with Ms. Wright's testimony regarding Mr. Duke's circumstances. Ms. Wright said that Mr. Duke signed the document while he was eating lunch, while the notary testified that the occasion she recalled had occurred very early in the morning, between 8:00 a.m. and 10:00 a.m. Ms. Wright testified that she helped Mr. Duke to sign his name, while the notary testified that on the occasion she recalled, she asked the two women to leave the room during the process, and she personally held the clipboard

-11-

for the patient when he had difficulty signing his name. Ms. Wright and Mrs. Duke both testified that the notary did not ask Mr. Duke any questions, while the notary testified that she had asked the patient whom she recalled several questions and that he would respond with a "yes" or "okay."

Keeping all of this evidence in mind, we now turn to the testimony of Mrs. Duke, because the Defendants contend that her deposition testimony demonstrates that Mr. Duke was competent. During her deposition, Mrs. Duke testified that Mr. Duke had asked Ms. Wright, after he was admitted to the psychiatric unit, to prepare the power of attorney and to bring it for him to sign the next time she visited him. At the hearing, she denied that this conversation occurred in December of 2005 and said that she had been mistaken. Mrs. Duke also testified during her deposition that Mr. Duke read the document before signing it, but at trial, she said that he was unable to read that day. Mrs. Duke testified at deposition that Mr. Duke was "with it" on the day that he was admitted to the Nursing Home and able to understand her, but at the hearing, she said he was happy but not competent. Mrs. Duke attempted to explain these inconsistencies in her testimony by stating that she was nervous at the deposition and afraid of getting Ms. Wright into trouble.[5] The trial court noted that it was "constrained to observe that there [were] substantial inconsistencies" in Mrs. Duke's testimony at the hearing and her deposition testimony, but it went on to conclude that Mrs. Duke was "clearly of the opinion that [Mr. Duke] did not understand what he was doing, didn't understand what the document was, didn't understand what he was executing, didn't understand what he was giving away." The trial court also concluded, regarding Ms. Wright's testimony, that "there's absolutely no question in her mind concerning her brother's mental state at that time that he clearly was not competent, and I use the legal word, or go further, not capable of understanding what he was doing, that communication was limited to yes responses types of things and was described as looking through you and not understanding, and she'd known this person for some 60 something years." Thus, despite the inconsistencies, the trial court apparently believed the testimony of Mrs. Duke and Ms. Wright that Mr. Duke did not know what was happening on the day that he signed the power of attorney. "Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility." *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (citing *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct.

_____

[5] During her deposition, Mrs. Duke also testified that Mr. Duke had admitted himself to the psychiatric unit and that he was able to make that decision at the time. It is undisputed that Mr. Duke was involuntarily admitted to the psychiatric unit after he was taken to the emergency room. A "Certificate of Need for Emergency Admission," prepared by the examining physician, is included in the record before us, which states that Mr. Duke was suffering from dementia and delusions and in need of involuntary placement in a facility. Counsel for the Defendants also conceded at oral argument that Mr. Duke was involuntarily admitted to the psychiatric unit.

App.1991)). Thus, trial courts are in the best position to resolve factual disputes hinging on credibility determinations, and we will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *Id.* Here, we find no clear and convincing evidence that would lead us to disagree with the trial judge's decision to credit the live testimony presented at the hearing.

Finally, in determining whether Mr. Duke lacked the capacity to execute the power of attorney on December 21, 2005, we must consider the testimony of Dr. Cain and the medical records that are before us. During Mr. Duke's first admission to the psychiatric unit in December of 2005, his global assessment of function score was a 15 out of 100, meaning "severely or catastrophically impaired." Mr. Duke's score at discharge was 35 out of 100, "showing some improvement but still severely impaired," and Dr. Cain estimated that a score of 35 was the highest level of function that Mr. Duke had attained in the past year. Dr. Cain described Mr. Duke as very confused, with impaired short term memory, ability to concentrate, and "executive functioning," meaning the ability to "understand what is going on around him." When given a "Mini Mental Status Exam," Mr. Duke scored a 14 out of 30, which Dr. Cain described as a low score indicative of cognitive impairment. Mr. Duke was not able to identify the year, month, day, or date, he could not identify the hospital where he was located, and he could not write a sentence of his own choice. Dr. Cain testified that Mr. Duke was "a very severely cognitively impaired gentleman" whom he would not want making important decisions for himself. Dr. Cain further testified that it did not appear that Mr. Duke was competent during the December 2005 admission to the psychiatric unit, or that he would have been able to make his own decisions. After reviewing the power of attorney document, Dr. Cain testified that he did not think that Mr. Duke would have been able to understand what he was signing, "even with the fluctuations in his cognitive abilities." Although Dr. Cain did say that he was "more comfortable" stating an opinion regarding Mr. Duke's condition when he personally treated Mr. Duke, and that he could not opine on Mr. Duke's competency or state of mind on December 21, 2005, to a reasonable degree of medical certainty, he reiterated that, more likely than not, Mr. Duke did not have the ability to understand the power of attorney document when he signed it.

We also have two medical record notations from the date when the power of attorney was signed. The first, recorded hours before the document was signed, stated that Mr. Duke "cannot comprehend and has no insight as to where he is, or why he is here." The second, noted shortly after the document was signed, states that Mr. Duke was alert and oriented to person, with no signs of paranoia or agitation, but that he was confused and did not know his name or the date. The "Discharge Summary" from the same date includes the psychiatrist's recommendation that Mr. Duke needed to remain in a locked assisted living placement.

Considering the entire record before us, and all of the relevant facts and circumstances, we have no serious or substantial doubt that Mr. Duke was incompetent to engage in the transaction at issue on December 21, 2005. In fact, we find no convincing evidence to suggest that Mr. Duke reasonably knew and understood the nature, extent, character, and effect of the transaction. Thus, we find no error in the trial court's finding, by clear and convincing evidence, that Mr. Duke lacked the capacity to execute the power of attorney document.

### B.   *"Looking Behind" the Power of Attorney Document*

On appeal, the Defendants also argue that they were entitled to rely upon the "facially valid power of attorney" and that the trial court should not have considered whether Mr. Duke was competent to execute it. As support for their argument, the Defendants rely upon the following footnote from our Supreme Court's decision in *Owens v. National Health Corp.*, 263 S.W.3d 876, 889 n.4 (Tenn. 2007):

> The plaintiff also questions whether [the nursing home patient] was incompetent to sign the nursing-home agreement when Daniel executed the contract pursuant to the power of attorney. The plaintiff asserts that the trial court should have permitted discovery regarding the circumstances surrounding the execution of both the nursing-home contract and the power of attorney, which was executed only twenty-one days later. We agree that discovery concerning whether [the nursing home patient] was incompetent to sign the nursing-home agreement should be permitted on remand. Discovery should not be permitted, however, concerning the validity of the power of attorney or the circumstances surrounding its execution. See Tenn. Code Ann. § 34-6-208 (providing immunity to health care providers who rely on decisions "made by an attorney in fact who the health care provider believes in good faith is authorized" to make health care decisions).

The statute relied upon by the Court in *Owens* is part of the Durable Power of Attorney for Health Care Act, Tenn. Code Ann. § 34-6-201, *et seq.* On appeal, the Defendants concede that the power of attorney executed by Mr. Duke "was a Durable Power of Attorney under Tenn. Code Ann. § 34-6-101 *et seq.* and is not strictly a health care power of attorney." The Uniform Durable Power of Attorney Act, Tenn. Code Ann. § 34-6-101, *et seq.*, contains no provision similar to the one cited by the Court in *Owens*. Nevertheless, the Defendants claim that the same reasoning should apply to general durable powers of attorney because it "seems unreasonable" to grant health care providers immunity for relying upon one type of power of attorney and not the other. They contend that "the intent of this statute is clearly to allow health care providers to rely on patient[s'] agents."

-14-

Because, as Defendants concede, Tennessee Code Annotated section 34-6-208 governs durable powers of attorney for healthcare, and it is inapplicable to the general durable power of attorney executed by Mr. Duke, the ***Owens*** decision does not prevent the trial court from considering the validity of the power of attorney in this case. The Defendants' argument regarding the wisdom of applying the same rule to powers of attorney executed under the Uniform Durable Power of Attorney Act, Tenn. Code Ann. § 34-6-101, *et seq.*, is a matter for the Legislature to determine, not this Court.

The Defendants basically argue that they had a good faith basis for relying upon the facially valid power of attorney, and therefore, the trial court should not have "looked behind" the face of the document. However, as this Court has previously explained,

> Nursing Home is not entitled, as it suggested on oral argument, to simply "rely upon someone who comes in and says, 'I'm the POA. I have the authority. Here's the Power of Attorney. Let me sign the documents.'" By signing the arbitration agreement, Daughter sought to bind Mother to a course of action that altered her legal rights. Unless Mother's power-of-attorney documents were in effect at the time – and we have already affirmed the trial court's ruling that they were not – Daughter did not have the power to do this.

***Hendrix v. Life Care Centers of America, Inc.***, No. E2006-02288-COA-R3-CV, 2007 WL 4523876, at *7 (Tenn. Ct. App. Dec. 21, 2007). "[A] power of attorney establishes an agency relationship by agreement. Thus, to have an agency relationship under a power of attorney, the principal must have the capacity to contract." ***Rawlings***, 78 S.W.3d at 297 n.1 (citing *Testa v. Roberts*, 44 Ohio App.3d 161, 542 N.E.2d 654, 658 (1988); *In re Thames*, 344 S.C. 564, 544 S.E.2d 854, 856-57 (App. 2001)). Because Mr. Duke did not have the capacity to contract when he executed the power of attorney, he did not thereby establish an agency relationship that would authorize Ms. Wright to act on his behalf. Without such authority, Ms. Wright did not bind Mr. Duke to the ADR Agreement that she signed.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the circuit court and remand for further proceedings. Costs of this appeal are taxed to the appellants, Kindred Healthcare Operating, Inc.; Kindred Healthcare, Inc.; Kindred Nursing Centers East, LLC; Kindred Hospitals Limited Partnership; Kindred Nursing Centers Limited Partnership f/d/b/a Huntingdon Health and Rehabilitation Center; and Anthony Lee Mays, in his capacity as Administrator of Huntingdon Health and Rehabilitation Center; and their surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.