IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 24, 2021 Session

## ESTATE OF PAGIEL HALL CZOKA ET AL. v. LIFE CARE CENTER OF GRAY ET AL.

**Appeal from the Circuit Court for Washington County**
**No. 37398     Jean A. Stanley, Judge**

_____

### No. E2020-00995-COA-R9-CV

_____

This case is about the requisite mental capacity to execute a power of attorney. After the death of Pagiel Hall Czoka ("Decedent"), Decedent's estate initiated a lawsuit against several defendants affiliated with the Life Care Center of Gray ("Defendants") in January of 2018. The estate's claims arose from an alleged assault on Decedent while she resided in Defendants' residential health-care facility in Gray, Tennessee. In response, Defendants sought to compel arbitration of all issues and claims based upon an arbitration agreement entered into by Defendants and Decedent's power of attorney when Decedent was admitted to Defendants' facility in 2015. The estate responded by asserting that Decedent lacked sufficient mental capacity to execute the power of attorney on the day it was signed and that the power of attorney and the arbitration agreement were therefore void. As such, the estate argued that Defendants' motion to compel arbitration should be denied and that the case should proceed to trial. The Circuit Court for Washington County (the "trial court") granted Defendants' motion to compel arbitration and the estate sought and was granted permission for this interlocutory appeal. Because the evidence in the record does not preponderate against the trial court's finding that Decedent had the requisite capacity to enter into the power of attorney on the date in question, we affirm.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

John S. Bingham, Kingsport, Tennessee, and Isaac T. Connor, Nashville, Tennessee, for the appellants, The Estate of Pagiel Hall Czoka and Clara Hall Czoka.

Alan S. Bean, Franklin, Tennessee, and Allen C. King, Birmingham, Alabama, for the appellees, Life Care Center of Gray and Life Care Centers of America, Inc.

# OPINION

## BACKGROUND

Decedent began showing signs of cognitive decline in the early months of 2012. By May of 2012, she was unable to continue working as an assistant to a professor at Boston University and had to seek long-term disability. While Decedent previously enjoyed reading, traveling, working, and playing tennis, she began having difficulty caring for herself due to short-term memory loss and disorganized thinking. Eventually, on August 25, 2012, Decedent was hospitalized at Beth Israel Deaconess Hospital in Boston. The doctors diagnosed Decedent with probable frontotemporal dementia which may have been exacerbated by a traumatic head injury several years earlier. Because Decedent could no longer drive or live on her own, the doctors at Beth Israel were faced with releasing Decedent to her family or sending her to an assisted living facility. Decedent's family in Kingsport, Tennessee was contacted and Decedent's sister, Kirsten Hoskins ("Kirsten"), and Kirsten's husband, Carlo Hoskins ("Carlo"), traveled to Boston to retrieve Decedent.

Upon returning to Tennessee, Decedent lived briefly with her mother, Clara Hall Czoka ("Mother"), before going to live full-time with Kirsten and Carlo. On September 28, 2012, Kirsten and Decedent went to the office of Kingsport, Tennessee attorney Gorman Waddell and executed two documents: a general power of attorney and a durable power of attorney for health care (together, the "powers of attorney"). Kirsten was named Decedent's power of attorney for both. Decedent was cared for by her family for several months after the execution of the documents; however, Decedent's condition eventually deteriorated such that she had to be placed in Defendants' residential facility in Gray. As Decedent's power of attorney, Kirsten signed Decedent's admission paperwork to the facility. One of the documents was a voluntary agreement for arbitration ("the agreement") which provided, as relevant:

> [Decedent and Defendants] agree that they shall submit to binding arbitration all disputes against each other and their agents, affiliates, governing bodies and employees arising out of or in any way related or connected to the Resident's stay and care provided at the Facility, including but not limited to any disputes concerning alleged personal injury to the Resident caused by improper or inadequate care, including allegations of medical malpractice, any disputes concerning whether any statutory provisions relating to the Resident's rights under Tennessee law were violated, and any other dispute under Tennessee or federal law based on contract, tort, or statute. Unless otherwise agreed to by the parties, a hearing arising under this Arbitration Agreement shall be held in the county where the facility is located.

Decedent was admitted to the facility in June of 2015, and her condition continued to

decline to the point that she required hospice care. Then, on or about October 1, 2016, Decedent was allegedly sexually assaulted by an employee of Defendant. The alleged assault on Decedent was the impetus of the estate's initial complaint against Defendants, which was filed in the trial court on January 24, 2018.[1] The essence of the complaint was that Defendants negligently hired and retained the employee who purportedly assaulted Decedent and that Defendants failed to act appropriately upon learning of the assault.

Defendants answered the complaint but then filed a motion to compel arbitration on October 22, 2018, asserting that the arbitration agreement executed by Kirsten on June 9, 2015 was binding on the parties. The estate responded by asking the trial court to stay arbitration and hold an evidentiary hearing on whether the agreement was valid. The estate's primary contention was that Decedent was not mentally competent to execute the powers of attorney on September 28, 2012.[2] Accordingly, an evidentiary hearing was scheduled for December 6, 2019, at which the parties would present evidence regarding Decedent's mental capacity on September 28, 2012.

At the December 6, 2019 hearing, the trial court heard extensive testimony from Decedent's family. Kirsten and Carlo both testified in detail regarding their September 2012 trip to Boston after which Decedent came home with them to Tennessee. Both Kirsten and Carlo expressed that Decedent had changed significantly since they last saw her, as Decedent had lost a substantial amount of weight, appeared extremely withdrawn, and engaged in very little conversation with them. Carlo and Kirsten also testified that when they met with Decedent's doctors in Boston, the doctors gave Decedent a poor prognosis and stressed that Decedent's cognitive functioning would continue to decline and that she would be unable to live independently. The doctors advised Decedent's family to take legal action that would allow Carlo and Kirsten to handle Decedent's finances for her. Although both Carlo and Kirsten recall discussing a conservatorship or a power of attorney with Decedent's doctors in front of Decedent, Kirsten and Carlo both testified that Decedent did not participate in these conversations nor did she ask any questions of her doctors. While packing up Decedent's apartment in Boston, Carlo and Kirsten found a note Decedent had written to herself which stated "eat lunch every day" and "eat dinner every day." Kirsten also recalled how Decedent was quite distraught during the trip to Tennessee, even going so far as to lay down and cry in a restaurant booth in the Boston airport; according to Kirsten, Decedent knew her life in Boston was ending and that she would not be coming back.

Kirsten explained that she, Carlo, and Decedent arrived in Kingsport on or about September 15, 2012. Upon their return, Decedent first stayed in her Mother's home for

---

[1] Decedent passed away in March of 2017. It is undisputed that Decedent's death was unrelated to the alleged assault.

[2] The estate made additional arguments as to why the arbitration agreement should not be enforced, however, none of those theories are at issue in this appeal.

several weeks before going to live with Kirsten and Carlo on October 6, 2012. Decedent's Mother also testified that she was surprised by the condition Decedent was in when Decedent returned to Tennessee, insofar as Decedent did not engage in conversation, needed help doing daily tasks, and largely stayed in her room or watched television during the day. Mother testified that Decedent could not operate her cell phone or the television remote, and Carlo confirmed that he observed Decedent tapping at her cell phone and becoming frustrated over being unable to operate it. Mother also recalled that Decedent did not attempt to read any books or newspapers despite having previously been an avid reader. Decedent would on occasion look through a magazine. Similarly, Carlo testified that at one point he offered Decedent a small book and Decedent declined, responding that she would not be able to read it. Sometime shortly after Decedent's arrival in Tennessee, Carlo took Decedent to play tennis as this was one of Decedent's favorite activities and she was an accomplished player. Because Decedent could not keep score, she and Carlo simply hit the ball back and forth; at one point, Carlo observed Decedent attempt to serve the tennis ball without having the ball in her hand and become confused.

All of Decedent's family members who testified consistently stated that Decedent had difficulty engaging in conversation and rarely if ever initiated conversation. Rather, they had to initiate conversation with Decedent by asking her very simple "yes or no" questions. The family's testimony reflects that while Decedent could respond to these simple questions, she had trouble responding to more complex questions or directions. Kirsten recalled an incident in which she attempted to play the game Candy Land with Decedent and Kirsten's young grandson. Decedent was unable to follow Kirsten's directions and could not play the game. Additionally, both Mother and Kirsten confirmed that Decedent had to be reminded about her personal care such as taking her medications, bathing, washing her hair, etc.

Nonetheless, the family's testimony also reflects that during September 2012 Decedent retained some ability to make decisions for herself and was able to do some every-day tasks. For example, Mother testified that while living with Mother, Decedent could get dressed and come downstairs on her own in the mornings and fix herself eggs and toast. Further, if Mother took Decedent to a restaurant, Decedent might order by pointing to what she wanted on the menu. Decedent could also point out the ingredients she wanted on a Subway sandwich, and Mother recalled that Decedent enjoyed eating pizza. Decedent's other sister, Holly Czoka ("Holly"), also lived with Decedent and Mother during September 2012. At the evidentiary hearing, Holly recalled an instance in which Decedent brought laundry downstairs to the washing machine but needed Holly's help starting the machine. Holly also recalled that a few days later, Decedent again brought her laundry down to the laundry room, apparently having forgotten that it had already been done. Overall, the family's testimony regarding Decedent's condition during September 2012 reflects that Decedent struggled with more involved tasks, such as using a washing machine or a cell phone, but could still exercise a small degree of autonomy and at times express what she wanted. Moreover, none of Decedent's family members ever suggested

- 4 -

that Decedent hallucinated, did not know who or where she was, or did not recognize her family. While Decedent clearly suffered from poor short-term memory and disorganized thinking, the testimony showed that Decedent was lucid and responsive during the weeks leading up to the signing of the powers of attorney.

Although the testimony of Decedent's family was helpful in painting a picture of Decedent's overall condition when she returned to Tennessee, there was little evidence presented regarding the day the powers of attorney were signed, September 28, 2012. In fact, the only evidence presented that was specific to that day was testimony from Kirsten and Gorman Waddell, the attorney who prepared the power of attorney documents. According to Kirsten, Decedent was still living at Mother's house on September 28, 2012, and Kirsten called Mother that morning to tell Mother that Decedent needed to get ready to go to Mr. Waddell's office. Kirsten then picked Decedent up and drove her to Mr. Waddell's office. Kirsten testified that while she had already reviewed the powers of attorney, Decedent had not read them and Kirsten did not discuss them with Decedent because Kirsten felt Decedent would not understand. As Kirsten recalled, there was never a conversation between she and Decedent regarding the details of what a power of attorney meant. Kirsten was of the opinion that even if she attempted to read the powers of attorney, Decedent would have been unable to comprehend them. However, Kirsten also testified that when they met with Mr. Waddell, Mr. Waddell asked Decedent if she wanted Kirsten to be Decedent's power of attorney and Decedent responded "yes." Further, Kirsten testified that when Mr. Waddell asked Decedent whether she understood what the documents meant, Decedent also responded "yes." Although Kirsten remained adamant that Decedent never herself read the powers of attorney, Kirsten testified that she did not recall whether someone at the attorney's office might have read the documents to Decedent or discussed their contents with her.

The estate also provided the deposition of Mr. Waddell, who testified that he had been practicing law for fifty-five years and had approximately thirty-five to forty years of experience in drafting powers of attorney. Regarding the date in question, Mr. Waddell stated that he had some memory but would not fairly describe it as "distinct." Rather, Mr. Waddell testified that his normal procedure for a client such as Decedent would be to prepare the documents in advance, send them to the client or clients to review, and then set up an appointment for the documents to be signed and notarized in person. Mr. Waddell could not recall whether Decedent asked him any particular questions about the powers of attorney on September 28, 2012. Importantly, however, Mr. Waddell insisted that if he had perceived any problems with Decedent's mental capacity that day, he would not have allowed her to sign the documents:

> Q. Did you have any reason on September 28, 2012 to question whether [Decedent] knew that she was going to sign a document that was going to make her sister her decision maker?

A. Did I have any reason to question that?

[Q]. Yes, sir.

[A]. No, I didn't have no question or reason to.

*** 

Q. If you thought, based on your personal judgment, your personal observation, your many years of doing this, that [Decedent] was not competent enough to enter into a contract that day, would you have allowed her to execute it?

A. I would not.

Q. Do you have any recollection, one way or the other, of whether [Decedent] indicated to you that she understood why she was signing the documents?

A. I don't recall that, no.

*** 

Q. On September 28, 2012 do you recall observing anything that led you to believe that [Decedent] was not competent enough to enter into these two power of attorney agreements?

A. No. If I had – as I previously said or stated, I would not have agreed for her to sign.

Neither Kirsten's nor Mr. Waddell's testimony reflects that Decedent was not lucid or oriented to her surroundings on September 28, 2012. Indeed, neither witness was able to recall with much particularity the details of that day. However, Mr. Waddell also candidly stated that he was not fully apprised of Decedent's condition when the documents were signed:

Q. So when you met with [Decedent] on September 28, 2012, you did not know that she had been diagnosed with dementia.

A. Oh, absolutely not.

Q. And nobody had told you that she had been diagnosed with dementia.

- 6 -

A. Not to my recollection.

Q. Are there any notes from your meeting with [Decedent] and [Kirsten] on September 28, 2012?

A. Not that I can locate.

Q. If you had known [Decedent] had been diagnosed with dementia, would that have made a difference to you?

A. It would have.

Q. Would you have done things differently?

A. Well, I would not have been the one to allow her to sign the documents.

Consequently, while Mr. Waddell's testimony on one hand suggested that there was nothing about Decedent's appearance or demeanor on September 28, 2012 that gave him pause, his testimony also reflects that Mr. Waddell had limited information about Decedent's health and would have proceeded differently if he knew the details of her diagnosis.

Finally, both parties relied on the testimony of expert witnesses at the December 6, 2019 hearing.[3]   Dr. Stephen Wayne, the estate's expert, was Decedent's treating neurologist in Kingsport and met her for the first time on October 9, 2012, approximately eleven days after the powers of attorney were signed. Dr. Wayne described Decedent as outspoken and pleasant. According to Dr. Wayne, Decedent presented with frontotemporal dementia and was experiencing severe deficits in her executive functioning. Decedent's diagnosis meant that Decedent was losing "the ability to plan, organize, do complex tasks, [and] think in advance." In describing Decedent's impairments in more detail, Dr. Wayne explained:

A. So, as I said before, her speech was fluent, if not eloquent, but she had trouble writing even a simple sentence. She had difficulty with attention and concentrating on things. She had difficulty with a routine clock drawing. She had some issues with her orientation. She couldn't name the month. She had difficulty generating a large number of animals in a minute, a fluency test.

Q. You mentioned the clock drawing. What is the clock drawing?

---

[3] Both experts testified by deposition.

A. You have the patient complete a clock where you have to put the numbers and the hands on the clock at a – something you specify. Usually it's ten minutes after 11:00. And so it tests different parts of the brain, but it's, you know, one of the many cognitive bedside tests you would do.

Q. I'm going to pass down to you page 25 of 96 from your chart and we will mark that as Exhibit 2-B, I believe we're on now. Is Exhibit 2-B the clock drawing that was done by [Decedent]?

A. Yes.

Q. Okay. And what time is it supposed to – are they asked to show on the clock?

A. Ten minutes after 11:00.

Q. Okay. And what has [Decedent] done?

A. She's either done 10:55 or 11:50. The hand lengths are the same, so you can't tell which is the short and which is the long hand.

Q. And what did that tell you about [Decedent]?

A. Well, it confirmed that something that most folks could do easily, she's having trouble, you know, understanding how to do it and performing it correctly.

Dr. Wayne also clarified what he meant in saying that Decedent's executive functioning was impaired, explaining that executive functioning is a person's ability to "plan and organize your day, to try to think of complex tasks you need to get done, and try to get them done and maintain attention for things that are happening, and to be able to avoid distractions[.]"

Additionally, Dr. Wayne testified that he had reviewed Decedent's medical records from the hospital in Boston and that, based on those records, Decedent was struggling with the same impairments in early September 2012 that she was when he first saw her. According to Dr. Wayne, Decedent's records from Boston indicated that by early September 2012 Decedent was already unable to live on her own, drive a vehicle, or generally go throughout her day without assistance. Dr. Wayne testified that Decedent's global deficits and impairments as of October 9, 2012 were so advanced that they would have preceded that day by at least two weeks.

However, Dr. Wayne also testified that when Decedent visited his office on October 9, 2012, Decedent was alert, spoke fluently, and was "oriented to place, purpose, and person." More specifically, Decedent knew on October 9, 2012 where she was and why she was there. Dr. Wayne testified that based on his notes from that visit, he likely asked Decedent why she was in his office and she said "something like I'm here for my memory." Dr. Wayne also acknowledged that his notes from that day showed Decedent had normal thought content, perception, and an "appropriate fund of knowledge." Decedent correctly named the president, his opposition in the then-current election, as well as the war the United States was engaged in at the time. Decedent was also able to write a sentence for Dr. Wayne, although it was extremely simple – "[t]he dog chased the cat." Importantly, Dr. Wayne also testified that Decedent's condition was such that she would have had "good days and bad days" in terms of her overall cognitive functioning:

> Q. Okay. Now, am I correct, Dr. Wayne, that a patient like [Decedent] who has a progressive fronto – frontotemporal dementia that they can have good days and they can have bad days?
>
> A. Yes.
>
> Q. And when we say that, what we mean is that on some days they can be more clear in terms of their thought processes than others.
>
> A. Sure, yes.
>
> Q. Some days they can be less confused than other days.
>
> A. Yes.
>
> Q. Some days their attention span can be greater than it might be on other days.
>
> A. Yes.
>
> Q. Some days their overall cognitive abilities may be better on certain days than they are on others.
>
> A. Yes.

Dr. Wayne also acknowledged that a cognitive impairment, standing alone, would not necessarily render someone incapable of understanding a power of attorney, but he noted that this would depend on the level of impairment at the time of execution. Dr. Wayne also stated that although Decedent would have been unable to understand the specifics of a power of attorney, she likely could have understood the concept that

"whatever [Decedent] was signing was going to accomplish [the] objective of naming her sister as her power of attorney." Ultimately, however, Dr. Wayne maintained that Decedent would have been unable, on September 28, 2012, to comprehend the substance of the agreements.

On the other hand, Defendants relied on Dr. Curt Hagenau, also a neurologist, as their expert witness. Dr. Hagenau's overall position was that notwithstanding Decedent's dementia diagnosis, she had not declined so significantly by September 28, 2012, that Decedent could not have understood the powers of attorney. Dr. Hagenau testified that he never examined Decedent and had only reviewed some of her medical records in reaching this conclusion. Nonetheless, Dr. Hagenau testified that many of his patients execute powers of attorney after having been diagnosed with dementia and that in his experience, it was normal for a dementia patient to execute a power of attorney even six to twelve months after their diagnosis. Dr. Hagenau also agreed with Dr. Wayne that a dementia patient's functioning would fluctuate from day to day, agreeing that some days would be clearer than others. Additionally, Dr. Hagenau pointed out that Decedent's medical records from Boston indicated that Decedent was also experiencing psychiatric issues such as anxiety and depression but that those issues stabilized once Decedent began receiving treatment and her family became involved in her care in September 2012. In this sense, Dr. Hagenau seemed to suggest that Decedent's cognitive impairments may have been more exacerbated by these psychiatric problems than by frontotemporal dementia and that Decedent's cognitive functioning could have improved once she came under her family's care.

Dr. Hagenau also pointed out that in June of 2012, Decedent filled out several forms from Liberty Mutual on her own, explaining that this demonstrated Decedent's "ability to focus on details." Here, Dr. Hagenau noted that Decedent's ability to write legibly and answer questions correctly in June 2012 suggested Decedent was likely still fairly competent by September 2012. To support this position, Dr. Hagenau also relied on the medical records from Decedent's hospital stay in Boston, noting that as of September 7, 2012 Decedent "ha[d] remained clear and consistent in her decision to declare her sister Kirsten to be her [health care proxy]." Dr. Hagenau discussed Decedent's discharge summary from September 14, 2012, which provided that Decedent "will also appoint [Kirsten] POA ultimately in consultation with a lawyer." In Dr. Hagenau's view, these notes reflected that Decedent communicated and deliberated with her doctors in Boston about making Kirsten her power of attorney and that the decision on September 28, 2012 to sign the documents was the culmination of an already well-laid plan. Additionally, Dr. Hagenau testified that the results of the exam given by Dr. Wayne on October 9, 2012 indicated that Decedent was not as severely impaired as suggested by Dr. Wayne. As pertinent, Dr. Hagenau stated:

A. Well, [Decedent] actually did pretty well with [the clock drawing]. For a patient with dementia on the spectrum of clock faces that I see, this is not all

that impaired. So she got all 12 of the major numbers and in relatively the right places. It looks like she initially put "11" at the top, so the "12" is a bit crowded in there, but it is much better than a lot of early dementia patients who crowd all 12 numbers into the right side of the clock face. They proceed with the numbering and take pride in the fact that they're getting the right numbers, but completely forget about spacing. The second part of the test is usually then to give the patient a time, such as ten minutes after 11:00, and ask them to put the hands on the clock face. And some patients can't even figure out that the hands should start at the center of the clock and go forward. Some are putting the – making marks on the outside of the circle or over the top of the numbers. So [Decedent's] hands are at least oriented in the right place. The only mistake she made was the abstraction that "1" represents five minutes and "2" represents ten minutes, so she more concretely drew the hands to both the "10" and the "11."

Q. And at the top of that page there's a sentence that says "The dog chased the cat." I'll represent to you that Dr. Wayne testified that [Decedent] wrote that sentence and that he couldn't recall whether he told her just to make it up or if he told her, "Write this sentence," and – and spoke it to her. Either way, is it significant to you that [Decedent] was able to write the sentence on that day?

A. Usually, as part of the Mini-Mental Status Examination, you just give the patient a pen and say, "Please write me a sentence." And so this was the sentence she came up with. It's – it's simple. It's normally structured. I would have expected her to come up with a – a normal sentence there, so no surprises.

Overall, Dr. Hagenau maintained that in his opinion, Decedent was capable of reasonably understanding the nature and consequences of a power of attorney agreement as of September 28, 2012:

Q. Based on all of the facts that you've reviewed in this case, do you have an opinion in terms of what's more likely than not as to whether [Decedent] knew why she was going to the attorney's office?

A. Yes, I believe that she did.

Q. And – and what is your opinion in that regard specifically?

A. Because her dementia had not progressed to the point that she was disoriented as to where she was or what she was doing, that her conversational skills, comprehension skills were generally intact, and

- 11 -

because of all of the prelude that led up to that day, all of the repetition and prepping that led up to that decision and the signing of the document.

The trial court issued its oral ruling on Defendants' motion on December 17, 2019, finding that the estate had not proven by clear, cogent, and convincing evidence that Decedent lacked the capacity to sign the powers of attorney on September 28, 2012. The essence of the trial court's ruling was that although Decedent was clearly impaired in some ways as of that date, Decedent could have comprehended that what she was signing would enable Kirsten to take care of Decedent and make decisions on Decedent's behalf. The trial court entered its final order on January 21, 2020. Thereafter, the estate sought permission for an interlocutory appeal, which this Court granted on September 2, 2020.

## ISSUES

The only issue on appeal is whether the trial court correctly concluded that Decedent possessed the requisite mental capacity at the time she executed the powers of attorney.

## STANDARD OF REVIEW

We review a trial court's grant or denial of a motion to compel arbitration pursuant to the same standards applicable to bench trials. *Mitchell v. Kindred Healthcare Operating, Inc.*, 349 S.W.3d 492, 496 (Tenn. Ct. App. 2008). As such, we review the record *de novo* with a presumption that the trial court's findings of fact "are correct unless the preponderance of the evidence is otherwise." *Id.* (quoting Tenn. R. App. P. 13(d)). The trial court's legal conclusions are reviewed without a presumption of correctness. *Id.*

The sole issue in this appeal is Decedent's mental capacity at the time the powers of attorney were signed. The mental capacity required to enter into a power of attorney is the same mental capacity required to enter into a contract. *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001). The mental capacity required to enter into a valid contract is a question of law. *Duke v. Kindred Healthcare Operating, Inc.*, No. W2010-01534-COA-R3-CV, 2011 WL 864321, at *7 (Tenn. Ct. App. Mar. 14, 2011) (citing *Rawlings*, 78 S.W.3d at 297). "However, whether a party possessed the required degree is a question of fact." *Id.* (citing *Dickson v. Long*, No. M2008-00279-COA-R3-CV, 2009 WL 961784, at *3 (Tenn. Ct. App. Apr. 8, 2009)). Consequently, we review the trial court's finding that Decedent had capacity to execute the powers of attorney with the presumption that this finding is correct.

## DISCUSSION

All adults are presumed to be competent to enter into contracts. *Rawlings*, 78 S.W.3d at 297 (citing *Uckele v. Jewett*, 642 A.2d 119, 122 (D.C. 1994)). "An ability to act with judgment and discretion" is not required for competency to contract. *Id.* (citing *In re*

*Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991)). Rather, all that is necessary is "that the contracting party reasonably knew and understood the nature, extent, character, and effect of the transaction." *Id.* (citing *Mays v. Prewett*, 98 Tenn. 474, 478, 40 S.W. 483, 484–85 (1897)); *see also Knight v. Lancaster*, 988 S.W.2d 172, 178 (Tenn. Ct. App. 1998) ("The test of mental capacity to contract is whether the person in question possesses sufficient mind to understand, in a reasonable manner . . . the act or transaction in which he is engaged; . . . the law does not gauge contractual capacity by the standard of mental capacity possessed by reasonably prudent men." (quoting *Roberts v. Roberts*, 827 S.W.2d 788, 791–92 (Tenn. App. 1991))).

Accordingly, the party seeking to invalidate a contract, in this case Decedent's estate, "bears the 'burden of proving that one or both of the contracting parties were mentally incompetent when the contract was formed.'" *Mitchell*, 349 S.W.3d at 501 (citing *Rawlings*, 78 S.W.3d at 297). "Specifically, persons seeking to show incapacity must prove either '(1) they are unable to understand in a reasonable manner the nature and consequences of the transaction or (2) they are unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of their condition.'" *Id.* Because of the presumption in favor of capacity to contract, mental incompetence must be proven by clear and convincing evidence. *Duke*, 2011 WL 864321, at *7 (citing *In re Armster*, No. M2000-00776-COA-R3-CV, 2001 WL 1285904, at *8 (Tenn. Ct. App. Oct. 25, 2001)). Evidence that is clear and convincing "eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn" therefrom. *Id.* (quoting *Milligan v. Bd. of Prof'l Responsibility*, 259 S.W.3d 631, 642 (Tenn. 2009)). "'It should produce in the fact-finder's mind a firm belief or conviction with regard to the truth of the allegations sought to be established.'" *Id.* Showing that a party to the contract "was depressed or had senile dementia" is insufficient to avoid a contract. *Rawlings*, 78 S.W.3d at 297 (footnote omitted). Instead, clear and convincing evidence must show that the individual's "cognitive impairment or disease rendered the contracting party incompetent to engage in the transaction at issue." *Dickson*, 2009 WL 961784, at *3; *see also Knight*, 988 S.W.2d at 178 (quoting *Roberts*, 827 S.W.2d at 791–92) ("[I]t has been held that to invalidate his contract there must be an entire loss of a person's understanding as respects such transaction.").

"Capacity is not an abstract, all-or-nothing proposition[,]" insofar as capacity speaks to "a person's actual ability to engage in a particular activity." *In re Conservatorship of Groves*, 109 S.W.3d 317, 333 (Tenn. Ct. App. 2003) (footnote omitted). In this sense, capacity is "situational and contextual[,]" and "[a] person may be incapacitated with regard to one task or activity while retaining capacity in other areas because the skills necessary in one situation may differ from those required in another." *Id.* at 334 (footnote omitted); *see also Dickson*, 2009 WL 961784, at *3 (same). Consequently, whether a person has capacity to enter into a contract is heavily dependent upon the particular facts and circumstances of that case. *Dickson*, 2009 WL 961784, at *3; *Knight*, 988 S.W.2d at 178.

Although the most salient evidence of capacity arises from the day the contract is executed, in similar cases we have also considered evidence regarding the parties' mental capacity in the days or weeks surrounding the day of execution of the contract. *See, e.g.*, *Duke*, 2011 WL 864321, at *8–9; *Waller v. Evans*, No. M2008-00312-COA-R3-CV, 2009 WL 723519, at *4–6 (Tenn. Ct. App. Mar. 17, 2009); *Dickson*, 2009 WL 961784, at *4; *but see In re Estate of Mayfield*, No. M2018-01977-COA-R3-CV, 2019 WL 4409218, at *10 (Tenn. Ct. App. Sept. 9, 2019) (stating that party's mental capacity "after signing the [a]greement" at issue was "irrelevant"). Additionally, both experts and "lay witnesses may provide evidence of an individual's competency or capacity." *Mayfield*, 2019 WL 4409218, at *10 (citing *In re Estate of Elam*, 738 S.W.2d 169, 172 (Tenn. 1987)).

Turning to the instant case, the trial court entered detailed findings of fact and conclusions of the law, ultimately finding that Decedent had sufficient capacity to execute the agreements on September 28, 2012. In pertinent part, the trial court found:

> [S]o the real issue for me, and what it came down to, and what made it so difficult, I think everybody has -- we all have different, but I think fairly good ideas of what happened with [Decedent] and how this process went for her, and how bad -- how rapidly it got really, really bad. But having said that, she also had these good days in between. So the dilemma for this Court is how was she on September the 28th, because I agree, that's the date I need to focus on. And the legal problem that I guess I worried with more than anything is how much did she have to understand about those powers of attorney for it to be a reasonable understanding. Her needs were very simple. It seems to me that you have to consider factually where a person is in their life and what their needs are when they execute a power of attorney. She needed to know she had a place to live, food to eat, clothes on her back, that somebody would take care of her medical issues, and if she had bills, somebody would get them paid. Those are pretty, like, really basic core concepts there. So I think for her, what she needed to understand was certainly not as detailed as everything that was contained in that power of attorney. For instance, the power of attorney refers to [Kirsten] [sic] would have been able to recover assets. Did [Decedent] know what recovering assets was, what it meant, what significance it had to her? I don't know if she did or not. If she had been asked we want to change your savings from a simple savings that has .02 percent on it to a CD, but you have to invest it for six years to get two percent, and if you do that with this amount of money and we figure the interest yearly, do you know how much you're going to get? No. She would not have had the faintest, not the foggiest notion of what we were talking about. But had I said to [Decedent] on that day, do you want Kirsten to take care of your money, I think [Decedent] could have said yes, I want Kirsten to take care of my money. So in the legal issue, is that enough? And I looked at the cases we had, and did a little research, and really spent a

- 14 -

lot of time thinking about this. What is -- what was reasonable for her to know and understand, and can I find by clear and convincing evidence that she did not and could not do that? I also thought about does it make a difference that the person who was appointed is a trusted, very close family member? Would the consideration be different if she brought in Joe Blow from off the street down here in Jonesborough and said I met him at the coffee house, I've known him for two weeks, but let's go let him drive me to the attorney's office to become my power of attorney? I think that's just a completely different situation. And I have noted throughout these records, she was clear, decisive, and committed to having Kirsten be her power of attorney. This is not a situation where somebody was trying to take advantage of her, or use her, or coerce her. There is absolutely no suggestion of any duress here obviously. On September the 28th, this Court feels that [Decedent] was a person who realized she needed help and she knew she was not going to be able to do it herself. She knew that she wanted Kirsten to take care of her and her concerns. She knew she wanted Kirsten to be in charge. This Court cannot make a finding by clear and convincing evidence that [Decedent] was not competent on that day to know and understand those things to the point that I would void this power of attorney.

Accordingly, while the trial court acknowledged that Decedent's overall cognitive functioning was limited as of September 28, 2012, it found that Decedent's capacity was not so limited as to render her incapable of understanding the nature, extent, character, and effect of the powers of attorney. Having thoroughly reviewed the record, we conclude that the evidence does not preponderate against this finding.

Again, there is very little evidence regarding the day Decedent and Kirsten executed the powers of attorney; indeed, the only evidence offered was testimony from Kirsten and Mr. Waddell, and Mr. Waddell testified that he did not have a distinct memory of September 28, 2012. The bulk of the evidence offered by the estate, rather, was anecdotal testimony regarding the weeks leading up to and after the signing of the powers of attorney on September 28, 2012. Further, the family had difficulty testifying specifically about when their different interactions with and observations of Decedent occurred; for example, Kirsten could not recall when she attempted to play Candy Land with Decedent, and Carlo could not recall when he attempted to give Decedent the book to read and she declined. Because Decedent lived with her family for several months after the powers of attorney were signed, the record reflects that some of what the family testified to may have occurred well after the execution of the documents. Consequently, the true probative value of some of the testimony regarding Decedent's condition is limited.

In any event, even the family's testimony regarding Decedent's condition that could be narrowed down to September 2012 reflects that while Decedent struggled with complex tasks and short-term memory around this time, Decedent was lucid and oriented

- 15 -

to her surroundings. Importantly, the family's testimony also indicates that Decedent was oriented enough to make small decisions for herself, such as picking out ingredients on a sandwich, making herself breakfast, or attempting to do laundry. These actions, albeit simple, indicate that Decedent could still identify what she wanted and that her behavior was grounded in reality.

To that point, cases similar to the one at bar suggest that when a contract is invalidated, the evidence tends to show that the person lacking capacity had no reasonable or rational perception or understanding of the transaction. For example, in *Duke*, 2011 WL 864321, we considered a trial court's finding that a man with Alzheimer's lacked capacity to make his sister his power of attorney. In that case, we affirmed this decision on appeal based upon ample evidence in the record that by the time the man ("Mr. Duke") signed the power of attorney, he was suffering from hallucinations, was dissociated from reality, and frequently did not know who or where he was. *Id.* at *8–10. The record in that case showed that Mr. Duke not only suffered from Alzheimer's but "sometimes became violent because he did not recognize his family members." *Id.* at *1. Mr. Duke held a gun to his wife's head on December 3, 2005 and was thereafter hospitalized. *Id.* Several weeks later, on December 21, 2005, Mr. Duke's sister, Ms. Wright, came to visit Mr. Duke in the psychiatric unit and brought power of attorney documents for Mr. Duke to sign. *Id.* At the hearing during which Mr. Duke's capacity was considered, Ms. Wright testified that the day the power of attorney was signed, her brother could not hold a conversation with her, did not recognize her, and was convinced that someone had stolen $500 from him. *Id.* at *2. The trial court in that case also heard testimony from doctors that Mr. Duke was aggressive with other patients in the psychiatric unit and experienced hallucinations, including an incident in which Mr. Duke believed that he had been kidnapped by a nun during the night and raped. *Id.* Mr. Duke would also respond to dogs that were not there and pick at imaginary bugs. *Id.* Additionally, the record contained progress notes from the day Mr. Duke signed his power of attorney, one of which provided:

> Slept 4–5 hrs. Pt became agitated at around 2215, pt slamming his hand on the nurses station, pt upset about not able to leave. Pt cannot comprehend and has no insight as to where he is, or why he is here. Pt medicated ... at 2230 due to his agitation and also noted him making bizarre footsteps on the floor tiles. Pt. able to rest calm down....

*Id.* at *6. *Duke* is an instructive contrast to the present case inasmuch as the record here does not indicate that Decedent was as impaired as Mr. Duke was when he signed his power of attorney. *Francis v. Barnes*, No. W2012-02316-COA-R3-CV, 2013 WL 5372851 (Tenn. Ct. App. Sept. 23, 2013), provides another helpful example. In that case, the dispute arose over a deed executed[4] in November 2010 by a woman ("Ms. Park") who

---

[4] The *Francis* court applied the same standard for capacity that is applicable here. 2013 WL 5372851, at *3 n.2 ("Because a deed is contractual in nature, we employ the standards used to determine

- 16 -

had been diagnosed with dementia and Alzheimer's in 2008 and 2009. *Id.* at \*1. The trial court found that Ms. Park's condition was so deteriorated by November 2010 that she lacked sufficient capacity to execute the deed. *Id.* at \*2. We upheld this decision, noting that by the time the deed was signed, Ms. Park was exhibiting irrational and delusional behaviors. *Id.* at \*5. For example, one witness testified that by the time the deed was executed, Ms. Park had become unable to use the restroom and would urinate into a can and pour it into her sink. *Id.* Ms. Park had also become paranoid and delusional, such as harboring unfounded fears that people were stealing from her or that she had lost her medication. *Id.* Additionally, a psychologist who evaluated Ms. Park in April 2010, approximately seven months before the deed was executed, testified that Ms. Park was already severely impaired and in need of a conservatorship. *Id.* Based on the foregoing, we concluded that the evidence did not preponderate against the trial court's finding that Ms. Park was not competent to execute the deed.

Although a person's ability to contract is heavily dependent on the facts and circumstances of the particular case, *Duke* and *Francis* illustrate some types of behaviors that might indicate someone is unable to understand, in a reasonable manner, the nature, extent, character, and effect of a transaction. In both of those cases, the evidence showed that the party at issue was exhibiting delusional behavior and appeared dissociated from reality around the time the pertinent documents were executed. In *Duke*, for example, there was evidence that Mr. Duke did not know who or where he was the very day he signed his power of attorney.

The record here, however, contains no such evidence. Indeed, there is no indication that on September 28, 2012, Decedent did not know who or where she was, was experiencing hallucinations, or did not recognize her family members. On the contrary, the evidence before us reflects that while Decedent was experiencing certain cognitive impairments as of September 28, 2012, she was still lucid, generally oriented to her surroundings, and responsive when prompted. While it is undisputed that Decedent lacked the capacity to engage in certain activities, such as operating a washing machine or a cell phone, lack of capacity for one activity does not dictate capacity as it relates to a different activity. *See Dickson*, 2009 WL 961784, at \*3 (quoting *Groves*, 109 S.W.3d at 333) ("[A] person may be incapacitated with regard to one task or activity while retaining capacity in other areas because the skills necessary in one situation may differ from those required in another.").

Moreover, although it is unclear from the record what exactly occurred at Mr. Waddell's office the day the powers of attorney were signed, Kirsten's testimony indicates that Decedent stated that she knew she was signing a document that would enable Kirsten to take care of Decedent and that this was what Decedent wanted. Kirsten also could

whether a person possess[es] mental capacity to contract." (citing *Richards v. Taylor*, 926 S.W.2d 569, 571 (Tenn. Ct. App. 1996))).

neither confirm or deny whether Mr. Waddell or one of his staff read the powers of attorney to Decedent or explained certain portions to her. Additionally, while the estate stresses Mr. Waddell's testimony that had he known about Decedent's diagnosis, he would have proceeded differently in executing the documents, we are unpersuaded by this. It is well-settled that a diagnosis of dementia, standing alone, does not render a person incompetent to contract. *Dickson*, 2009 WL 961784, at *3; *Mitchell*, 349 S.W.3d at 501; *Rawlings*, 78 S.W.3d at 298. Consequently, Mr. Waddell's testimony that he might have more carefully questioned Decedent had he known about her dementia is not probative of whether Decedent's condition rendered her incompetent on that particular day in regards to a power of attorney agreement. *See Rawlings*, 78 S.W.3d at 297 ("It is not enough to prove that a person was depressed or had senile dementia. To prove mental incapacity, the person with the burden of proof must establish, in light of all the surrounding facts and circumstances, that the cognitive impairment or disease rendered the contracting party incompetent to engage in the transaction at issue[.]") (footnotes omitted). Stated differently, even if Mr. Waddell had questioned Decedent more thoroughly on September 28, 2012, she may very well have been able to sufficiently answer his questions.

Finally, even Dr. Wayne's testimony does not indicate that on or about September 28, 2012, Decedent was experiencing delusional thinking, irrational behavior, or detachment from reality. Rather, his own records reflect that when he met with Decedent eleven days after the powers of attorney were signed, Decedent had fluent speech, could write a complete sentence, and knew where she was and why she was there. Decedent's recognition that she was seeing Dr. Wayne because of her memory problems also suggests Decedent was aware of her limitations. Further, Kirsten testified that when she took Decedent to Dr. Wayne's office on October 9, 2012, the receptionist gave Decedent intake paperwork which Decedent then gave to Kirsten and asked Kirsten to fill it out. Dr. Wayne's and Kirsten's testimony regarding that day suggest Decedent was oriented to her surroundings and knew that Kirsten was there to assist her. Accordingly, the evidence suggests that Decedent comprehended the essence of a power of attorney agreement insofar as Decedent knew that she was unable to do certain things for herself and that Kirsten had the ability and responsibility to help Decedent.

Considering all of the facts and circumstances of this case, we cannot conclude that the evidence preponderates against the trial court's finding that Decedent had capacity to sign the powers of attorney on September 28, 2012. This conclusion is buttressed by the undisputed testimony from both parties' expert witnesses that patients with Decedent's condition experience some days that are better than others in terms of their level of clarity or impairment, and the fact that the record reveals very little about Decedent's mental status on September 28, 2012.[5] Further, we are required to begin with the presumption that

_____

[5] Our conclusion in this particular case should not be taken to mean that a power of attorney will never be invalidated for lack of mental capacity in the absence of voluminous evidence regarding the precise day the document is signed. As we have already stated, cases involving mental capacity must "be resolved

- 18 -

Decedent had the requisite capacity to contract, and the estate had the burden of proving by clear, cogent, and convincing evidence otherwise. Bearing this framework in mind, we conclude that the evidence does not preponderate against the trial court's finding that Decedent understood enough on September 28, 2012, to comprehend that she was entering into an agreement that would enable Kirsten to care for Decedent and make financial and health care decisions on Decedent's behalf. Because "an ability to act with judgment and discretion is not required for competency to contract[,]" we agree with the trial court that this understanding is sufficient for us to conclude that Decedent "reasonably knew and understood the nature, extent, character, and effect of the transaction at issue." *Rawlings*, 78 S.W.3d at 297. Accordingly, we affirm the trial court's finding that Decedent had the requisite mental capacity to enter into the power of attorney agreements as of September 28, 2012.

## CONCLUSION

The order of the trial court granting Defendants' motion to compel arbitration is affirmed, and the case is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to the appellants, the Estate of Pagiel Hall Czoka and Clara Hall Czoka, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE

---

in the light of the facts of each case and the surrounding circumstances." *Knight*, 988 S.W.2d at 178 (quoting *Roberts*, 827 S.W.2d at 791–92). Here, however, the absence of evidence regarding Decedent's mental status on the day in question is of particular importance because the evidence arising from the days surrounding September 28, 2012 indicates Decedent was still be oriented to her surroundings and lucid, and the estate bore the burden of showing that this was not so on September 28, 2012.